# Exhibit A

EXECUTION VERSION

# LEASE

BETWEEN

## METROPOLITAN TRANSPORTATION AUTHORITY, AS LANDLORD

### AND

## WESTFIELD FULTON CENTER LLC, AS TENANT

## FULTON CENTER

**TABLE OF CONTENTS**

PAGE

1.    Definitions. ................................................................................. 2

2.    Term. .......................................................................................... 29
      2.1    Stabilization Period. ...................................................... 29
      2.2    Initial Term. .................................................................... 29
      2.3    Renewal Options. ............................................................ 29

3.    Landlord's Work; Delivery of Premises; Tenant Controlled Signage. ............ 29
      3.1    Landlord's Work. ............................................................ 29
      3.2    Delivery of Commercial Usage Areas in Tenant-Ready Condition. .................. 30
      3.3    Entry by Tenant Prior to Interim Delivery Date. ..................................... 31
      3.4    Entry by Tenant Between Applicable Delivery Date and Opening Date. ........... 31
      3.5    Material Physical Impairment. ........................................... 31
      3.6    Opening Date. ................................................................... 31
      3.7    Tenant Controlled Signage. ............................................... 31

4.    Rent. ........................................................................................... 32
      4.1    Rent Derived from Signage Revenues. ............................... 32
      4.2    Participation Rent Derived from Commercial Revenues. .................. 34
      4.3    Rent Derived From Sponsorship Revenues. ......................... 34
      4.4    Guaranteed Minimum Rent During the Renewal Terms. .............. 35
      4.5    Offset. ............................................................................. 36
      4.6    Payment. .......................................................................... 36
      4.7    Monthly Statements; Annual Statements; Reconciliation. ............... 36
      4.8    Contracts with Affiliates. ................................................... 40
      4.9    Additional Rent. ............................................................... 40

5.    Use. ............................................................................................ 40
      5.1    Retail Standard. ............................................................... 40
      5.2    Signage. .......................................................................... 42
      5.3    Arts Programming. ............................................................ 44
      5.4    Use of NYCT Retained Areas. ........................................... 44
      5.5    Storage Areas/Deliveries. ................................................. 45
      5.6    Trade Name. ..................................................................... 45
      5.7    Operating Hours. .............................................................. 45
      5.8    Tenant's Manner of Operation: No Unauthorized Use of Public Areas. ........... 45
      5.9    Pest Control; Trash Disposal. ............................................ 46
      5.10   Grease Traps. ................................................................... 46
      5.11   Con Ed Equipment and Facilities. ..................................... 46
      5.12   MWBE. ............................................................................ 47
      5.13   Compliance with Labor Laws. ........................................... 47
      5.14   Commencement of Tenant's Responsibilities. ....................... 47

| | | | |
|---|---|---|---|
| 6. | | Compliance. | 47 |
| | 6.1 | Generally. | 47 |
| | 6.2 | Landlord as Government Agency. | 47 |
| | 6.3 | Copies of Notices. | 48 |
| | 6.4 | FTA Requirements. | 48 |
| | 6.5 | Prohibited Persons. | 49 |
| 7. | | Maintenance, Repairs and Services. | 49 |
| | 7.1 | Maintenance and Repairs; Cleaning. | 49 |
| | 7.2 | Maintenance and Repair of Structural Components. | 56 |
| | 7.3 | Utilities. | 57 |
| | 7.4 | Center Security. | 57 |
| | 7.5 | Sprinkler System. | 59 |
| | 7.6 | Fire Alarm System. | 59 |
| | 7.7 | Compliance with FTA Requirements. | 60 |
| | 7.8 | No Other Services. | 60 |
| 8. | | Construction. | 60 |
| | 8.1 | Construction. | 60 |
| | 8.2 | Plans and Specifications; Code Compliance. | 61 |
| | 8.3 | Corbin Building. | 63 |
| | 8.4 | Security for Tenant's Work. | 63 |
| | 8.5 | Labor Harmony. | 63 |
| 9. | | Subleasing. | 63 |
| | 9.1 | Subleases. | 63 |
| | 9.2 | Recognition of Subtenants. | 64 |
| | 9.3 | Assignment of Commercial Revenues. | 65 |
| | 9.4 | Required Provisions. | 65 |
| | 9.5 | Assignment of Reading Room Agreement. | 66 |
| 10. | | Communications Protocols. | 67 |
| 11. | | Prohibited Liens. | 67 |
| | 11.1 | Tenant's Covenant. | 67 |
| | 11.2 | Protection of Landlord. | 67 |
| 12. | | Hazardous Substances. | 68 |
| | 12.1 | Restrictions. | 68 |
| | 12.2 | Compliance; Clean-Up. | 68 |
| | 12.3 | Pre-Existing Conditions. | 68 |
| 13. | | Indemnification; Liability of Landlord. | 69 |
| | 13.1 | Indemnity by Tenant. | 69 |
| | 13.2 | Indemnity by Landlord. | 69 |
| | 13.3 | Relationship of Indemnities to Commercial General Liability Insurance. | 69 |
| | 13.4 | Enforcement of Indemnification Obligations of Subtenants. | 70 |
| | 13.5 | Enforcement of Indemnification Obligations of Service Contractors and | |

23958769v39

|  |  | *Construction Contractors.* | 70 |
|---|---|---|---|
|  | *13.6* | *Management of Third-Party Liability Claims; Landlord's Right to Contest.* | 70 |
|  | *13.7* | *Liability of Landlord.* | 71 |
|  | *13.8* | *Indemnification Procedures.* | 71 |
| 14. |  | Insurance Requirements. | 71 |
|  | *14.1* | *Landlord and Tenant – Property Insurance.* | 71 |
|  | *14.2* | *Tenant's Liability and Other Insurance.* | 73 |
|  | *14.3* | *Insurance for Construction.* | 74 |
|  | *14.4* | *Subtenant's and Service Contractor's Insurance.* | 77 |
|  | *14.5* | *General Insurance Requirements.* | 78 |
|  | *14.6* | *Insurance Submission Requirements.* | 79 |
|  | *14.7* | *No Limit on Tenant's Liability.* | 80 |
|  | *14.8* | *Right to Request Additional Insurance and Limits.* | 80 |
|  | *14.9* | *Waiver of Subrogation.* | 80 |
|  | *14.10* | *Blanket and/or Master Policies.* | 80 |
|  | *14.11* | *Suspension of Work / Event of Default.* | 80 |
| 15. |  | Losses and Loss Proceeds. | 81 |
|  | *15.1* | *Prompt Notice.* | 81 |
|  | *15.2* | *Casualty.* | 81 |
|  | *15.3* | *Disposition of Insurance Proceeds.* | 82 |
|  | *15.4* | *Substantial Condemnation.* | 82 |
|  | *15.5* | *Insubstantial Condemnation.* | 83 |
|  | *15.6* | *Temporary Condemnation.* | 83 |
|  | *15.7* | *Condemnation Affecting Tenant Controlled Signage.* | 83 |
|  | *15.8* | *Disbursement of Loss Proceeds.* | 83 |
|  | *15.9* | *Continuation of Lease.* | 83 |
|  | *15.10* | *Disputes.* | 83 |
| 16. |  | Representations and Warranties. | 83 |
|  | *16.1* | *Due Authorization and Execution.* | 83 |
|  | *16.2* | *No Litigation.* | 84 |
|  | *16.3* | *FIRPTA.* | 85 |
|  | *16.4* | *Office of Foreign Assets Control.* | 85 |
|  | *16.5* | *Special Purpose Entity.* | 85 |
| 17. |  | Landlord Controlled Equipment. | 85 |
| 18. |  | NYCT Retained Areas. | 85 |
| 19. |  | Transfers. | 85 |
|  | *19.1* | *Transfer of Lease.* | 85 |
|  | *19.2* | *Transfers of Equity Interests.* | 86 |
|  | *19.3* | *Replacement Guarantor.* | 86 |

iii

20. Self Help Rights...................................................................................................86
    20.1 Landlord's Right to Cure.............................................................................86
    20.2 Tenant's Right to Cure...............................................................................87

21. Quiet Enjoyment; Title to Certain Premises; Certain Agreements.......................87
    21.1 Quiet Enjoyment........................................................................................87
    21.2 Access and Inspection................................................................................87
    21.3 Title...........................................................................................................88

22. Events of Default; Remedies..............................................................................88
    22.1 Definition of "Event of Default".................................................................88
    22.2 Remedies...................................................................................................89
    22.3 Proceeds of Reletting.................................................................................91
    22.4 Tenant's Late Payments; Default Interest...................................................92
    22.5 Holding Over.............................................................................................92
    22.6 Waivers.....................................................................................................92
    22.7 Accord and Satisfaction; Partial Payments.................................................93
    22.8 Miscellaneous...........................................................................................93

23. Arbitration........................................................................................................93
    23.1 Third-Party Arbitration...............................................................................93
    23.2 Specific Provisions.....................................................................................94
    23.3 Binding Effect............................................................................................95
    23.4 Other Rights and Obligations Not Affected................................................95

24. End of Term......................................................................................................95

25. Notices.............................................................................................................96

26. Brokers.............................................................................................................96

27. Additional Deliveries; Third Parties...................................................................96
    27.1 Estoppel Certificates..................................................................................96
    27.2 Further Assurances.....................................................................................97
    27.3 Net Lease...................................................................................................97
    27.4 Modification...............................................................................................97
    27.5 Successors and Assigns..............................................................................97

28. Miscellaneous...................................................................................................97
    28.1 Costs and Expenses; Legal Costs................................................................97
    28.2 No Consequential Damages........................................................................98
    28.3 No Waiver by Silence.................................................................................98
    28.4 Performance Under Protest.........................................................................98
    28.5 Survival.....................................................................................................98
    28.6 Unavoidable Delay.....................................................................................98
    28.7 Financial Statements...................................................................................98
    28.8 Development Rights....................................................................................98

29. Interpretation, Execution, and Application of Lease. .................................................... 100
    29.1 Captions. ................................................................................................................. 100
    29.2 Counterparts. ......................................................................................................... 100
    29.3 Delivery of Drafts. ................................................................................................ 100
    29.4 Entire Agreement. ................................................................................................. 100
    29.5 Governing Law. ..................................................................................................... 100
    29.6 Partial Invalidity. .................................................................................................. 100
    29.7 Principles of Interpretation. ................................................................................. 100
    29.8 Lobby Law Certification. ...................................................................................... 101

**Attachments:**

**Exhibit A** = Lease Demarcation Plans
**Exhibit B** = Usage Plans
**Exhibit C** = Location of Tenant Controlled Signage and Landlord Controlled Signage
**Exhibit C-1** = Specifications for Base Tenant Controlled Signage
**Exhibit D** = Comparison Stores
**Exhibit E** = Form of Guaranty
**Exhibit F** = Notice Addresses (Including Required Copy Recipients)
**Exhibit G** = Form of Estoppel Certificate
**Exhibit H** = Special Purpose Entity Covenants
**Exhibit I** = Named and Additional Insureds
**Exhibit J** = Landlord's Forms of Required Certificates of Insurance
**Exhibit K** = Concept of Operations
**Exhibit L** = Design Guidelines
**Exhibit M** = List of Prohibited Uses
**Exhibit N** = MWBE Programs and Requirements
**Exhibit O** = FTA Grant Management Requirements
**Exhibit P** = Core and Shell/Base Building Plans and Specifications
**Exhibit Q** = Substantial Completion and Final Completion
**Exhibit R** = Utility Allocation
**Exhibit S** = Prohibited Person Vetting Process
**Exhibit T** = Close-Out Items
**Exhibit U** = Risk Management Procedure
**Exhibit V** = Items to be included in Monthly Statements and Annual Statements
**Exhibit W** = Hypothetical Illustration of the Calculation of Guaranteed Minimum Rent
**Exhibit X** = Lobbying Law Certification

## LEASE

This **LEASE** (this "Lease") is made and entered into as of the 16th day of May, 2014 (the "Lease Execution Date"), between Metropolitan Transportation Authority, a public benefit corporation of the State of New York ("Landlord"), and Westfield Fulton Center LLC, a Delaware limited liability company ("Tenant").

## $W I T N E S S E T H:$

WHEREAS, Landlord is currently completing the redevelopment of the transportation complex known as the Fulton Center located in Lower Manhattan (the "Fulton Center"), which encompasses the following improvements, all of which are identified by the following names on the plans attached hereto as **Exhibit A** (the "Lease Demarcation Plans"): (a) the Fulton Building, located at the intersection of Broadway and Fulton Street (the "Fulton Building"); (b) the Corbin Building, located at the intersection of Broadway and John Street (the "Corbin Building"); (c) the Dey Street Headhouse, located at the intersection of Broadway and Dey Street (the "Dey Street Headhouse"); (d) the Dey Street Concourse, comprising subsurface improvements located under Dey Street between Broadway and Church Street (the "Dey Street Concourse"); (e) the R Line Underpass, comprising subsurface improvements located under Church Street at the western end of the Dey Street Concourse (the "R Line Underpass"); (f) the 4/5 Line Underpass, comprising subsurface improvements located under Broadway at the eastern end of the Dey Street Concourse (the "4/5 Line Underpass"); (g) the subsurface improvements identified on the Lease Demarcation Plans and referred to herein as (i) "A/C Mezzanine West" and "A/C Mezzanine East"; (ii) "2/3 Line Platform" and "2/3 Line Mezzanine"; (ii) "J/Z Line Northbound Platform" and "J/Z Line Southbound Platform"; (iii) "R Line Platform"; and (iv) "4/5 Line Platform" and (h) the entrances and stairs to and from the  street level to the subway lines identified on the Lease Demarcation Plans (collectively, the "Subway Street Level Entrances," which term, for the avoidance of doubt, does not include the entrances to the Dey Street Headhouse, or any entrances to or within the Corbin Building or the Fulton Building);

WHEREAS, Landlord is the fee owner of the portions of the Fulton Center depicted in yellow and identified on the Lease Demarcation Plans as the "Master Lease Premises" (referred to in this Lease as the "Premises"), and Landlord's affiliate the New York City Transit Authority ("NYCTA") controls the balance of the Fulton Center pursuant to a long-term master lease between the City of New York and NYCTA;

WHEREAS, Landlord desires to lease the Premises to Tenant and Tenant desires to lease the Premises from Landlord, subject to and in accordance with the terms and conditions contained herein;

WHEREAS, it is anticipated that on or about the commencement of the term of this Lease, Landlord will assign to NYCTA Landlord's fee interest in the Premises and interest as landlord under this Lease;

WHEREAS, the Premises include not only interior spaces within the Fulton Building, Corbin Building, Dey Street Headhouse, Dey Street Concourse, R Line Underpass and 4/5 Line Underpass but also the exterior and structural elements thereof;

**WHEREAS,** the interior spaces within the Premises comprise four different types of areas, which are identified on the plans attached hereto as **Exhibit B** (the "Usage Plans") as (i) "Unpaid Public Circulation," (ii) "Paid Public Circulation," (iii) "Commercial Usage Areas," a portion of which is exclusively for retail use, and (iv) "Back of House," which areas are further described and defined in this Lease;

**WHEREAS,** the Premises do not include the areas depicted in blue and green and identified on the Lease Demarcation Plans as (i) "NYCT" and (ii) "Third Party," which areas are further described and defined, and referred to, in this Lease as "NYCT Retained Areas" and "Third Party Areas," respectively;

**WHEREAS**, the NYCT Retained Areas consist primarily, but not exclusively, of the A/C Mezzanine West and A/C Mezzanine East; the 2/3 Line Platform and 2/3 Line Mezzanine; the J/Z Line Northbound Platform and J/Z Line Southbound Platform; the R Line Platform; the 4/5 Line Platform; and the Subway Street Level Entrances;

**WHEREAS,** the Premises will include the multimedia displays described under the heading "Tenant Controlled Signage" on **Exhibits C** and **C-1** (each such individual display, and any replacement thereof, a "Tenant Controlled Sign" and collectively, together with the associated equipment, the "Tenant Controlled Signage") at the locations shown on **Exhibit C** ("Signage Locations"), which include certain locations within the A/C Mezzanine East and the A/C Mezzanine West, which Tenant shall operate for profit, subject to and in accordance with the terms and conditions contained in this Lease;

**WHEREAS,** as set forth on **Exhibits C** and **C-1**, the Tenant Controlled Signage is divided into two groups for purposes of this Lease, designated as the "Base Tenant Controlled Signage" and the "Additional Tenant Controlled Signage";

**WHEREAS**, the Parties desire to enter into this Lease to set forth their rights and obligations to each other relating to the Premises, NYCT Retained Areas and Third Party Areas; and

**WHEREAS**, concurrently with the execution and delivery of this Lease, Westfield America Limited Partnership, a Delaware limited partnership ("Guarantor"), is executing and delivering to Landlord a payment and performance guaranty in the form of **Exhibit E** (the "Guaranty");

**NOW, THEREFORE,** for good and valuable consideration, Landlord leases and demises the Premises to Tenant, and Tenant takes and hires the Premises from Landlord, for the Term, upon the terms and conditions of this Lease.

    *1.*    *Definitions.*  The following definitions apply in this Lease.

    "1st Level Initial Threshold"  has the meaning set forth in Section 4.2.1.

    "1st Level Participation Rent"  has the meaning set forth in Section 4.2.1.

    "1st Level Participation Rent Cap"  has the meaning set forth in Section 4.2.1.

"2nd Level Initial Threshold" has the meaning set forth in Section 4.2.2.

"2nd Level Participation Rent" has the meaning set forth in Section 4.2.2.

"2/3 Line Mezzanine" has the meaning set forth in the Recitals.

"2/3 Line Platform" has the meaning set forth in the Recitals.

"4/5 Line Underpass" has the meaning set forth in the Recitals.

"AAA" means the American Arbitration Association.

"A/C Mezzanine East" has the meaning set forth in the Recitals.

"A/C Mezzanine West" has the meaning set forth in the Recitals.

"A/C Mezzanine" means the A/C Mezzanine East and the A/C Mezzanine West.

"Actual Life Span" has the meaning set forth in Section 7.1.3.

"Actual Life Span Cost" has the meaning set forth in Section 7.1.3.

"Additional Rent" means all sums that this Lease requires Tenant to pay Landlord, excluding Participation Rent and Guaranteed Minimum Rent payments, whether or not expressly called Additional Rent.

"Additional Retail Signage" has the meaning set forth in Section 5.2.2.

"Additional Signage Participation Rent" has the meaning set forth in Section 4.1.2(c).

"Additional Tenant Controlled Signage" has the meaning set forth in the Recitals and **Exhibits C** and **C-1**.

"Affiliate" of any specified Person means any other Person Controlling or Controlled by or under common Control with such specified Person. "Affiliated" shall have the correlative meaning.

"Annual Escalation" means, with respect to any amount that is subject to Annual Escalation, that such amount is increased by 3%, compounded annually, as of the beginning of each Lease Year other than the first Lease Year.

"Annual Statement" has the meaning set forth in Section 4.7(b) and **Exhibit V**.

"Anti-Money Laundering and Anti-Terrorism Laws" means (a) the USA PATRIOT Act of 2001 and the regulations administered by the United States Treasury Department's Office of Foreign Assets Control ("OFAC"), (b) orders issued by OFAC, (c) Executive Order 13224 issued by the President of the United States on September 23, 2001 and

made effective as of September 24, 2001, and (d) similar laws or orders hereafter in effect from time to time.

"Applicable Delivery Date" means (a) the Lease Execution Date, for the Corbin Building and the Retail Usage Areas within (i) the Dey Street Headhouse, (ii) the Dey Street Concourse, (iii) the R Line Underpass and (iv) the 4/5 Line Underpass, (b) the Interim Delivery Date, for the Retail Usage Areas (excluding the RMUs) in the Fulton Building, or (c) the date of Substantial Completion of Landlord's Work, for the balance of the Premises.

"Applicable Lease Year" has the meaning set forth in Section 4.4.1.

"Applicable Month" has the meaning set forth in Section 4.4.1.

"Application" means any agreement or application with respect to any Approval.

"Approvals" means, subject to the terms and conditions of Section 6.2, any and all licenses, permits (including building, demolition, alteration, use, and special permits), approvals, consents, certificates (including certificate(s) of occupancy), rulings, variances, authorizations, or amendments to any of the foregoing, as shall be required under any Law for the commencement, performance or completion of any Construction, or the use, occupancy, maintenance, or operation of the Premises.

"Arbitration" means the procedure for binding alternative dispute resolution set forth in Article 23.

"Arbitration Notice" has the meaning set forth in Section 23.1.

"Arbitrator" has the meaning set forth in Section 23.1.

"Architect" means, for any Construction, the architect or engineer of record for such Construction, which architect or engineer shall be  (a) selected by Tenant or a Subtenant; (b) not an Affiliate of Tenant; (c) licensed in the State; (d) reasonably qualified and experienced in overseeing projects similar to the Construction for which such architect or engineer is engaged; and (e) in connection with any Major Construction, subject to approval by Landlord, which approval shall not be unreasonably withheld or delayed.

"Arrearage Exception" has the meaning set forth in Section 4.7(a).

"Audit Period" has the meaning set forth in Section 4.7.2.

"Available Rent Offset" means, as of the end of any month, the sum of (a) the amount of the Stabilization Period Operating Deficit Net Accrual, if any, as of the end of such month, *plus* (b) the amount of the Tenant Commercial Liability Expenses Net Accrual, if any, as of the end of such month, *plus* (c) the amount of any Capital Expenditure Offset Amount, determined in accordance with Section 7.1.3, 7.1.4, 7.2.1 or 15.2, as applicable, to the extent such Capital Expenditure Offset Amount has not theretofore or concurrently therewith been credited against Rent.

4

23958769v39

"Back of House Areas" means the areas of the Premises identified on the Usage Plans as "Back of House."

"Bankruptcy Law" means Title 11, United States Code, and any other or successor state or federal statute relating to assignment for the benefit of creditors, appointment of a receiver or trustee, bankruptcy, composition, insolvency, moratorium, reorganization, or similar matters.

"Bankruptcy Proceeding" means any proceeding, whether voluntary or involuntary, under any Bankruptcy Law.

"Base Building Equipment" means the mechanical equipment and systems, the electrical equipment and systems and vertical circulation equipment and other base building equipment incorporated in the Premises (including any replacement thereof), exclusive of Tenant/Subtenant Equipment, Tenant Controlled Signs and Landlord Controlled Property.

"Base Signage Participation Rent" has the meaning set forth in Section 4.1.1(c).

"Base Tenant Controlled Signage" has the meaning set forth in the Recitals and **Exhibits C** and **C-1**.

"BID" means any business improvement district or similar district or program, proposed or actual, that includes, may include, or affects the Premises.

"Break-Even Date" means a date to be designated by Tenant, prospectively or retrospectively, by written notice to Landlord given during or within a reasonable time after the end of the Stabilization Period, which date shall be the last day of a calendar month and shall occur prior to or at the end of the Stabilization Period, and which date is intended, but is not required, to be the approximate beginning of the period during the remainder of the Stabilization Period in which Commercial Revenues for such remainder period exceed Tenant O & M Expenses for such remainder period.

"Business Day" means any weekday on which New York State-chartered banks are open to conduct regular banking business with bank personnel.

"Capital Expenditures" means expenditures that should be capitalized under GAAP.

"Capital Expenditure Offset Amount" has the meaning set forth in Section 7.1.4.

"Capital Expenditure Offset Reimbursement" has the meaning set forth in Section 7.1.4.

"Casualty" means any damage or destruction affecting the Premises arising from (i) a risk of loss covered by an "All Risk" property damage insurance policy described in Section 14.1.1(a) or Section 14.1.2(a), regardless of whether such insurance has in fact been maintained, other than any individual loss if the resulting damage or destruction costs less than $5,000 (subject to Annual Escalation) to repair and less than $40,000 (subject to Annual Escalation) in

5

the aggregate for all individual losses sustained in any Lease Year, or (ii) a Material Structural Failure.

"Casualty Termination" means a termination of this Lease because of a Casualty, when and as this Lease expressly allows such a termination.

"Chronic Default" has the meaning set forth in Section 22.1.5.

"Close-Out Items" means the items listed on **Exhibit T**.

"Code Compliance" means, with respect to any Construction, compliance with all building and fire codes applicable thereto.

"Code Compliance Review Process" means the process for determining Code Compliance required by Landlord in its capacity as the Government with authority with respect thereto.

"Commercial Participation Rent" means, collectively, 1st Level Participation Rent and 2nd Level Participation Rent.

"Commercial Revenues" means all revenues of Tenant (or any Affiliate of Tenant) derived from the Commercial Usage Areas, including any and all fixed rent, percentage rent, "key money" paid by a Subtenant, proceeds of business interruption insurance, proceeds of any Condemnation Award relating to a temporary taking of any Commercial Usage Area, contributions for common area or operating expenses and utility charges and other fees and charges however denominated, but excluding (a) security or construction deposits, until and unless applied, and (b) any state or city sales, excise, gross receipt or similar taxes now or hereafter collected and paid by Tenant (or such Affiliate) on account of such revenues. Commercial Revenues shall include revenues from RMUs and exclude Signage Revenues and Sponsorship Revenues. The accounting treatment of "key money" paid by a Subtenant and base rent under a Sublease that has a Free Rent Period is addressed in Section 4.7(a).

"Commercial Net Revenues" means, for any period, the Commercial Revenues for such period, *less* the sum of (a) the Tenant O & M Expenses for such period, and (b) the amount, if any, by which the Ongoing Capital Expenditures for such period exceed $250,000 per Lease Year ($20,833.33 per month) (such $250,000 and $20,833.33 amounts being subject to Annual Escalation).

"Commercial Usage Areas" means the areas of the Premises identified on the Usage Plans as "Commercial Usage Areas," which include the Retail Usage Areas as well as areas that may be used for non-retail purposes.

"Communications Protocols" has the meaning set forth in Section 10.

"Comparable Facilities" has the meaning set forth in Section 5.1.

6

"Comparison Stores" means retail stores, food service establishments and restaurants set forth on **Exhibit D**. Such list of Comparison Stores is subject to change from time to time in accordance with Section 5.1.

"Comparison Years" has the meaning set forth in Section 4.4.1.

"Concept of Operations" means the manual outlining specifications for the maintenance and operation of the Premises attached hereto as **Exhibit K**, as it shall be supplemented in due course by O&M Manuals. In the event of any conflict between this Lease (excluding **Exhibit K**) and the Concept of Operations, this Lease shall control.

"Condemnation" means (a) any temporary or permanent taking of the Premises or any portion thereof, or of the right to use or occupy the Premises or any portion thereof, by condemnation, eminent domain, or any similar proceeding; or (b) any action by any Government not resulting in an actual transfer of an interest in, or of the right to use or occupy, the Premises but creating a right to compensation, such as a change in grade of any street upon which the Premises abut.

"Condemnation Award" means any award paid or payable (whether or not in a separate award) to either Party after the Lease Execution Date because of, or as compensation for, any Condemnation, including (a) any award made for any improvements that are the subject of the Condemnation; (b) the full amount paid or payable by the condemning authority for the estate that is the subject of the Condemnation, as determined in the applicable Condemnation proceedings; (c) any interest on such award; and (d) any other sums payable on account of such Condemnation.

"Condemnation Effective Date" means, for any Condemnation, the first date when the condemning authority has acquired title to or possession of any Premises subject to the Condemnation.

"Con Ed" means Consolidated Edison, Inc.

"Construction" means any alteration, construction, demolition, reconstruction or Restoration done in the Premises by or on behalf of Tenant or any Person claiming by or through Tenant, including construction of any Subtenant Improvements. Construction includes Minor Construction and Major Construction. Repair and maintenance in the ordinary course shall not be deemed to constitute Construction. Mere decoration of Commercial Usage Areas shall not be deemed to constitute Construction, but shall nonetheless be consistent with the Retail Standard and, to the extent applicable, be consistent with the Design Guidelines and comply with the requirements of Section 8.3.

"Construction Warranty" means a manufacturer's or contractor's warranty referenced in Section 4.7 of the Concept of Operations.

"Construction Documents" means, with respect to any Major Construction, the following documents, as such documents may be modified by the parties thereto from time to time: (a) a contract between Tenant or any Subtenant, as applicable, as owner, and the Architect

7

for such Major Construction, relating to the Architect's preparation of the Plans and Specifications for such Major Construction; (b) a contract between Tenant or any Subtenant, as applicable, as owner, and such Person's general contractor or construction manager; and (c) any Major Subcontracts.

"Contractor-Related Liability Claims" has the meaning set forth in Section 13.5.

"Control" means the possession, directly or indirectly, of (a) at least 20% of the direct or indirect ownership of the Equity Interests of a Person (provided that, as applied to the term Affiliate as used in clause (a) of the definition of Prohibited Person, "at least 20%" shall be replaced by "more than 50%"); or (b) the power to direct or cause the direction of the management and policies of such Person, whether by ownership of Equity Interests, by contract, or otherwise.

"Corbin Building" has the meaning set forth in the Recitals.

"Core and Shell/Base Building Improvements" means the Improvements to be made to the Premises by Landlord in accordance with the Core and Shell/Base Building Plans and Specifications, including those of such Improvements that are required for the Premises to be in Tenant-Ready Condition, as such Improvements may be modified and/or replaced from time to time in accordance with this Lease.  Core and Shell/Base Building Improvements includes Base Building Equipment, but not Landlord Controlled Property.

"Core and Shell/Base Building Plans and Specifications" means the plans and specifications for the Core and Shell/Base Building Improvements, as such plans and specifications may be modified from time to time in accordance with the terms of this Lease.  As of the date hereof, the plans and specifications for the Core and Shell/Base Building Improvements are referenced on **Exhibit P**.

"County" means New York County.

"CPI" means the United States Department of Labor, Bureau of Labor Statistics "Consumer Price Index" for Urban Wage Earners and Clerical Workers (CPI-W) published for New York - Northern New Jersey - Long Island, NY-NJ-CT-PA, with a base of 1982-1984 = 100.  If the CPI ceases to be published, with no successor index, then the Parties shall reasonably agree upon a reasonable substitute index.  The CPI for any date means the CPI last published before the calendar month that includes such date.

"CPI Adjustment Factor" means, as of any date, the greater of (a) 1.00 or (b) the CPI for such date divided by the CPI as of the Lease Execution Date.

"C/S Contractor" means the contractor hired by Landlord to construct the Core and Shell/Base Building Improvements.

"Default" means Tenant's uncured default or breach under this Lease.

"Default Interest" means interest at an annual rate equal to the lesser of (a) the Prime Rate plus 4% per annum; or (b) the Usury Limit.

23958769v39

"Default Notice" means a notice of a Default under this Lease, describing the Default in reasonable detail.

"Design Guidelines" means the guidelines set forth on **Exhibit L**.

"Design Review Process" means the process for review and approval of Plans and Specifications by Landlord, in its capacity as landlord, for the purpose of confirming compliance with the Design Guidelines.

"Dey Street Concourse" has the meaning set forth in the Recitals.

"Dey Street Headhouse" has the meaning set forth in the Recitals.

"E&O Policy" means the $10 million project-specific insurance policy that Landlord has heretofore obtained with respect to errors and omissions of the designers of the Core and Shell/Base Building Improvements.

"Emergency" has the meaning set forth in Section 20(a).

"Environmental Law" means any Law concerning: (a) air, ground water, soil or other environmental conditions at, in, under or above the Premises; or (b) clean-up, control, disposal, generation, storage, release, transportation, or use of, or liability or standards of conduct concerning, Hazardous Substances at, in, under, above the Premises.

"Equipment Lien" means any security interest, financing lease, personal property lien, conditional sales agreement, chattel mortgage, security agreement, title retention arrangement or similar arrangement (including any related financing statement) for Tenant's or any Subtenant's acquisition or leasing of any Tenant/Subtenant FF&E used in the Premises that is leased, purchased under conditional sale or installment sale arrangements, or used under a license, provided that each Equipment Lien encumbers or otherwise relates only to the Financed Tenant/Subtenant FF&E for which such secured party provides bona fide purchase-money financing or a bona fide equipment lease after the Lease Execution Date and provided that such secured party is not an Affiliate of Tenant or the applicable Subtenant.

"Equity Interest" means, with respect to any Person, all or any part of any direct or indirect equity or ownership interests, whether stock, partnership interest, beneficial interest in a trust, membership interest, or other interest of an ownership or equity nature, in such Person at any tier of ownership.

"Estoppel Certificate" means a statement by one Party, addressed to the designee of the requesting Party, in substantially the form of **Exhibit G** and containing such other assurances as the requesting Party may reasonably request.

"Event of Default" has the meaning set forth in Section 22.1.

"Excluded Commercial Liability Expenses" has the meaning set forth in the definition of Tenant Commercial Liability Expenses.

9

23958769v39

"Expiration Date" means the date when this Lease terminates or expires in accordance with its terms, whether on the Scheduled Expiration Date, by Landlord's exercise of remedies for an Event of Default, or otherwise.

"FCSS" has the meaning set forth in Section 7.4(b).

"FDNY" means the Fire Department of the City of New York.

"Fee Estate" means Landlord's fee estate in the Premises, including Landlord's reversionary interest in the Premises after the Expiration Date.

"Final Completion" or "Finally Complete" has the meaning provided on **Exhibit Q**.

"Financed Tenant/Subtenant FF&E" means any Tenant/Subtenant FF&E subject to an Equipment Lien. Tenant shall deliver, or cause to be delivered, to Landlord a copy of any document evidencing an Equipment Lien, upon request by Landlord.

"Free Rent Period" means, with respect to any Sublease, any period after the earlier of the date upon which the applicable Subtenant opens for business or the day such Subtenant is required under its Sublease to open for business during which period such Subtenant is not required to pay base rent; provided that, if a Subtenant of office space in the Commercial Usage Areas completes construction of its Subtenant Improvements prior to completion of the reasonably allotted time therefor set forth in its Sublease, the remainder of such allotted time shall not be considered a Free Rent Period. The Free Rent Period shall be considered part of the term of the applicable Sublease for purposes of the calculation under Section 4.7(a).

"FTA" means the United States Department of Transportation, Federal Transit Administration.

"Fulton Building" has the meaning set forth in the Recitals.

"Fulton Center" has the meaning set forth in the Recitals.

"Fulton Center Security System" has the meaning set forth in Section 7.4(b).

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time.

"Government" means each and every governmental agency, authority, bureau, department, quasi-governmental body or other public entity or instrumentality having jurisdiction over the Premises.

"Grant Management Requirements" means the pertinent FTA requirements set forth in Circular FTA C 5010.1D dated November 1, 2008, which pertinent FTA requirements are those provisions from such circular that are attached hereto as part of **Exhibit O**.

"Guaranteed Minimum Rent" has the meaning set forth in Section 4.4.1.

23958769v39

"Guarantor" has the meaning set forth in the Recitals.

"Guaranty" has the meaning set forth in the Recitals.

"Hazardous Substances" includes flammable substances, explosives, radioactive materials, asbestos, asbestos-containing materials, polychlorinated biphenyls, chemicals known to cause cancer or reproductive toxicity, pollutants, contaminants, hazardous wastes, medical wastes, toxic substances or related materials, explosives, petroleum and petroleum products, and any "hazardous" or "toxic" material, substance or waste that is defined by those or similar terms or is regulated as such under any Law, including any material, substance or waste that is (a) defined as a "hazardous substance" under Section 311 of the Water Pollution Control Act (33 U.S.C. § 1317), as amended; (b) defined as a "hazardous waste" under Section 1004 of The Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901, et seq., as amended; (c) defined as a "hazardous substance" or "hazardous waste" under Section 101 of The Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Reauthorization Act of 1986, 42 U.S.C. § 9601 et seq. or any so-called "superfund" or "superlien" law, including the judicial interpretations thereof; (d) defined as a "pollutant" or "contaminant" under 42 U.S.C.A. § 9601(33); (e) defined as "hazardous waste" under 40 C.F.R. Part 260; (f) defined as a "hazardous chemical" under 29 C.F.R. Part 1910; or (g) subject to any other Law regulating, relating to or imposing obligations, liability or standards of conduct concerning protection of human health, plant life, animal life, natural resources, property or the enjoyment of life or property free from the presence in the environment of any solid, liquid, gas, odor or any form of energy from whatever source.

"Hazardous Substances Discharge" means any deposit, discharge, generation, release, or spill of Hazardous Substances that occurs at or from the Premises, or into the land underlying the Premises, or that arises at any time from the use, occupancy or operation of the Premises or any activities conducted therein or any adjacent or nearby real property, or resulting from seepage, leakage, or other transmission of Hazardous Substances from other real property to such land, whether or not caused by a Party and whether occurring before or after the Lease Execution Date.

"Immaterial Loss" means a Casualty or Condemnation that is not a Substantial Casualty or Substantial Condemnation, respectively.

"Impositions" means (a) all taxes, assessments including all assessments for public improvements or benefits, whether or not commenced or completed prior to the date hereof and whether or not to be completed within the Term (including all interest and penalties thereon), water and sewer rents and charges, charges for public utilities, excises, levies, license fees, permit fees, inspection fees and other authorization fees and other charges of every nature and kind whatsoever together with all expenses incident to the installation, repair, replacement and/or reading of water meters (including all interest and penalties thereon), and legal fees associated with any reduction proceedings relative to such taxes, not in excess of such reduction, in each case, whether general or special, (b) business improvement district charges, special district charges, and (c) all other governmental, administrative and/or quasi-governmental levies, impositions or charges, ordinary, extraordinary, foreseen or unforeseen, of every type and nature whatsoever, in each case, which at any time during or in respect of the Term may be assessed,

11

levied, charged, confirmed or imposed on Tenant, this Lease, any Subtenant or any Sublease, or in respect of, or be (i) a lien upon the Premises or any Sublet Premises, (ii) any rent therefrom or any estate, right or interest therein, (iii) any occupancy, use or possession of or activity conducted on the Premises or any part thereof including any Sublet Premises (including any taxes and/or assessments levied in lieu of, the foregoing due to a change in the method of taxation), and (d) all taxes and assessments that may, during the Term, be levied or assessed against any personal property located in, or upon the Premises, or any portion thereof including any Sublet Premises, and either owned by Tenant or any Subtenant or used by Tenant or any Subtenant in connection with the operation of the Premises or any portion thereof including any Sublet Premises, to the extent that such taxes and assessments, if unpaid, would result in a lien against the Premises or any portion thereof, including any Sublet Premises; provided, however, that, notwithstanding anything to the contrary contained in this Lease, in no event shall Tenant be obligated to pay any Real Property Tax in connection with the Fulton Center, the Premises, or any portion thereof, it being agreed and understood that any such Real Property Tax is specifically excluded from this definition of Impositions, nor shall Impositions include any income taxes assessed against Landlord, franchise, estate, inheritance or transfer taxes of Landlord unless such taxes, or any one or more of them, shall hereafter be implemented by the taxing authority in lieu of, or in replacement or substitution of any existing Imposition.

"Improvements" means buildings, structures, fixtures and other improvements, including components thereof.

"Indemnitees" shall mean the Landlord Indemnitees or the Tenant Indemnitees, as the context requires.

"Initial Capital Expenditures" means Capital Expenditures incurred by Tenant prior to the Break-Even Date, including: (a) costs of responding to Landlord's request for proposals and negotiating and entering into this Lease, (b) costs of conducting due diligence with respect to the Premises, and participating in the initial inspection, commissioning and acceptance of the Core and Shell/Base Building Improvements, (c) costs of hiring and training initial staff and entering into initial service contracts relating to the maintenance and operation of the Premises (as distinct from recurring payroll expenses and service contract obligations following the Opening Date), (d) leasing commissions for the initial Subleases for all Sublet Premises and other costs of marketing and promoting the Commercial Usage Areas for initial lease-up or opening, including attorneys' fees; (e) with respect to the Subtenant Improvements for initial Subleases (including initial Subleases of RMUs), the amounts expended by Tenant as allowances paid to Subtenants for such Improvements or expended by Tenant in itself constructing such Improvements; (f) costs of constructing and equipping the tool shop at the Premises to prepare the tool shop for initial operation; (g) costs of constructing and equipping the management office at the Premises to prepare the management office for initial operation; and (h) the amount, if any, paid to the Reading Room for the surrender of the Reading Room Lease.

"Initial Term" has the meaning set forth in Section 2.2.

"Insubstantial Condemnation" means any Condemnation except a Substantial Condemnation or a Temporary Condemnation.

23958769v39

"Insurance Requirements" means the requirements of any insurer to the extent such requirements apply to the Premises, to the use or manner of use of the Premises or to Tenant in its capacity as lessee of the Premises.

"Interim Delivery Date" has the meaning set forth in Section 3.2.

"J/Z Line Northbound Platform" has the meaning set forth in the Recitals.

"J/Z Line Southbound Platform" has the meaning set forth in the Recitals.

"Landlord" means the owner from time to time of fee title to the Premises, which owner is initially the MTA and will at all times during the Term be either the MTA or NYCTA or a successor thereto, and if fee title to the Premises is transferred between the MTA and NYCTA then the Landlord shall be the grantee in any such transfer unless and until fee title to the Premises is so transferred again, in which event the transferee shall thereupon become the Landlord.

"Landlord Controlled Equipment" means the fare control equipment, fare vending equipment, telecommunications equipment, fire/life safety equipment, sprinkler system, security cameras and other security equipment, in each case to the extent installed by Landlord, as such equipment shall be altered from time to time.

"Landlord Controlled Property" means Landlord Controlled Equipment, Landlord Controlled Signage and/or Landlord FF&E.

"Landlord Controlled Signage" means the digital signage that is specified under the heading "Landlord Controlled Signage" on **Exhibit C**, and the other, conventional signage shown on the MTA Signage Drawings, all of which has been or will be installed by Landlord in the Public Circulation Areas for the benefit of NYCTA and its customers, as such signage shall be altered and/or supplemented from time to time in accordance with this Lease (excluding, however, the following two signs shown on such drawings—sign T.S.B3.2302 on drawing 4F-BG-T-S-202 located on the street level and sign T.C.B.4.2412 on drawing 4F-BG-T-C-202 located on the concourse level, which signs, Landlord agrees, shall not be installed).

"Landlord FF&E" means furniture, furnishings, equipment and other personal property of Landlord or its Affiliates or contractors that shall be located in but not attached to the NYCT Retained Areas.

"Landlord Indemnitees" means Landlord, the Government of the United States and the Additional Insureds as defined on **Exhibit I** and any and all Affiliates of any of the foregoing, and their respective agents, directors, officers and employees.

"Landlord's Code Compliance Officer" means a duly designated representative of Landlord or any of its Affiliates, who shall be responsible for monitoring and determining Code Compliance matters hereunder from time to time.

"Landlord's Construction Records" means the following materials with respect to Landlord's Work to the extent existing: (i) inspection and test results, governmental sign-offs

13

and certifications of engineers, the architect of record and the C/S Contractor, (ii) a report from the architect of record and the C/S Contractor listing the punch-list items and specifying what work remains incomplete in order for the Premises to achieve Final Completion, which report from such C/S Contractor will include a plan and schedule for completion of such work, (iii) reports with respect to the commissioning of equipment and the mechanical, electrical, fire-safety, security and plumbing systems within the Premises, (iv) the final or temporary certificates of occupancy issued for Premises, and (v) the Close-Out Items.

"Landlord's Forms of Required Certificates of Insurance" has the meaning set forth on **Exhibit J**.

"Landlord's Representative" means an agent or employee of Landlord responsible for (a) determining on behalf of Landlord whether Landlord's contractors shall have achieved Substantial Completion and Final Completion of Landlord's Work, and (b) monitoring Tenant's compliance with the Concept of Operations and the Design Guidelines.

"Landlord's Work" means construction by Landlord (at its sole cost) of the Core and Shell/Base Building Improvements in accordance with the Core and Shell/Base Building Plans and Specifications.

"Laws" means all laws, ordinances, requirements, orders, proclamations, directives, rules, and regulations of any Government affecting the Premises, this Lease, or any Construction in any way, including any use, maintenance, taxation, operation, or occupancy of, or environmental conditions affecting, the Premises, or relating to any Impositions, or otherwise relating to this Lease or any Party's rights and remedies under this Lease, or any Transfer, whether in force at the Lease Execution Date or passed, enacted, or imposed at some later time, subject in all cases, however, to any applicable waiver, variance, or exemption.

"Lease Demarcation Plans" has the meaning set forth in the Recitals.

"Lease Execution Date" has the meaning set forth in the Preamble.

"Lease Related Documents" has the meaning set forth in Section 16.1(a).

"Lease Termination Notice" means a notice stating this Lease is being terminated by reason of any Event of Default, and describing such Event of Default in reasonable detail.

"Lease Year" means (a) the period commencing on the Opening Date and ending on December 31 of the same year in which the Opening Date occurs, and (b) each calendar year thereafter during the Initial Term (and, if applicable, each Renewal Term), up to and including the Expiration Date.

"Leasehold Estate" means Tenant's leasehold estate, and all of Tenant's rights and privileges, under this Lease, upon and subject to all the terms and conditions of this Lease.

"Legal Costs" of any Person means all reasonable costs and expenses (including reasonable attorneys' fees and court costs) such Person incurs in any legal proceeding, including

23958769v39

any Bankruptcy Proceeding or in taking any other action for which such Person is entitled hereunder to be reimbursed for its Legal Costs.

"Loss" means any Casualty or Condemnation.

"Loss Proceeds" means Condemnation Awards and/or Property Insurance Proceeds.

"Major Construction" means any Construction that (a) affects the Structure, or (b) adversely (or potentially adversely) affects any utilities or systems of the Fulton Center. For purposes of the preceding clause (b), the installation of Tenant/Subtenant Equipment, the installation of any electrical components, plumbing fixtures or other equipment or components within the Sublet Premises, and the connection thereof to utility lines and equipment serving the Fulton Center in order to provide utility and other services to the Sublet Premises, shall not be Major Construction so long as such installation and connection complies with applicable building and fire codes and is consistent with applicable load limitations and other applicable specifications set forth in the Design Guidelines.

"Major Liability Claims" means the incidents or claims listed as items 1 through 8 on **Exhibit U** under the heading "Incidents/Claims Requiring Immediate Reporting to the NYCTA."

"Major Subcontracts" means any structural, electrical, plumbing or HVAC subcontracts entered into for any Major Construction.

"Manufacturer Specifications" means, with respect to (a) any major Base Building Equipment, the O&M Manual therefor, and (b) any other Non-Structural Components, the manufacturer's or vendor's conditions or requirements for honoring the Construction Warranty therefor as specified in such Construction Warranty, or if no such conditions or requirements apply, reasonable requirements as recommended by Tenant's service contractors.

"Material Physical Impairment" means a change in or deviation from the Core and Shell/Base Building Improvements Plans and Specifications that results in a material reduction in ceiling heights in any portion of the Premises or any other material intrusion by shafts, pipes, ducts, conduits, wires, risers and other fixtures, equipment or appurtenant facilities into any portion of the Premises, it being agreed that such materiality standard will vary depending on the location of the portion of the Premises that is so affected. Compliance with such plans and specifications will be strictest in the Commercial Usage Areas compared to the Public Circulation Areas or Back of House Areas, and, accordingly, a lesser deviation from such plans and specifications may constitute a Material Physical Impairment in the Commercial Usage Areas whereas the same deviation in the Public Circulation Areas or Back of House Areas may not necessarily constitute a Material Physical Impairment.

"Material Structural Failure" has the meaning set forth in Section 7.2.1.

"Minor Construction" means any Construction that Tenant or any Subtenant undertakes from time to time, except Major Construction.

15

23958769v39

"Modification" means any abandonment, amendment, cancellation, discharge, extension, modification, rejection, renewal, replacement, restatement, substitution, supplement, surrender, termination, or waiver of a specified agreement or document, or of any of its terms or provisions, or the acceptance of any cancellation, rejection, surrender, or termination of such agreement, document, or terms.

"Modify" means agree to, cause, make, or permit any Modification.

"Monetary Default" means Tenant's failure to pay any Rent as and when this Lease requires.

"Monthly Statement" has the meaning set forth in Section 4.7(a) and **Exhibit V**.

"MTA Police Department" means the police department of the Metropolitan Transportation Authority, as constituted from time to time.

"MTA Signage Drawings" means the set of drawings designated "Contract A-36125 Transit Center Enclosure, Contract Drawings, Revised Drawings, 8th November 2013."

"Multi-Property Package Deals" has the meaning set forth in Section 4.1.5.

"MWBE Programs and Requirements" has the meaning set forth on **Exhibit N**.

"Nonmonetary Default" means Tenant's (a) failure to comply with any affirmative or negative covenant or obligation in this Lease, except a Monetary Default; or (b) breach of any representation or warranty as of the date made or deemed made.

"Non-Structural Components" means elements of the Premises other than Structural Components, Subtenant Improvements, Tenant Controlled Signage and Landlord Controlled Property.

"Notice of Default" or "Default Notice" means any notice alleging a Default.

"NYCTA" has the meaning set forth in the Recitals.

"NYCT Retained Areas" has the meaning set forth in the recitals.

"NYPD" means the New York City Police Department.

"NYPD Security System" has the meaning set forth in Section 7.4(b).

"O&M Manual" means, with respect to any Base Building Equipment, the manufacturer's operating and maintenance manual therefor, if any.

"Offset Eligible Replacement" has the meaning set forth in Section 7.1.4.

"Ongoing Capital Expenditures" means, for any period following the Break-Even Date, all Capital Expenditures made in respect of such period by Tenant in performing Tenant's

23958769v39

obligations and exercising its rights under this Lease, including (a) leasing commissions for Subleases and other costs of entering into Subleases, including attorneys' fees; (b) amounts expended by Tenant as allowances paid to Subtenants for Subtenant Improvements or expended by Tenant in itself constructing such Improvements; and (c) expenditures for capital repairs or replacements of Base Building Equipment or other elements of the Premises; provided, however, that Ongoing Capital Expenditures shall exclude (in addition to Initial Capital Expenditures and amounts expended by Subtenants), amounts described in clauses (a) and (b) with respect to initial Subleases, Signage Capital Expenditures, Capital Expenditure Offset Amounts, and any Capital Expenditures funded by Landlord or using insurance proceeds or attributable to Tenant's gross (as distinguished from ordinary) negligence or willful misconduct (or, as applicable to Section 7.1.4, Tenant Recklessness).

"Opening Date" means the date when the entirety of the Public Circulation Areas shall be open to the public.

"Operating Hours" means the hours for the operation of the Retail Usage Area as set forth in Section 5.7.

"Paid Public Circulation Areas" means the areas of the Premises identified on the Usage Plans as "Paid Public Circulation."

"Participation Rent" means, collectively, Signage Participation Rent, Sponsorship Participation Rent and Commercial Participation Rent.

"Party" means Landlord or Tenant, as the context requires; and "Parties" means, collectively, Landlord and Tenant.

"Performance Records" has the meaning set forth in Section 4.7.2.

"Performance Records Default" has the meaning set forth in Section 4.7.3.

"Periodic Service" has the meaning set forth in Section 7.1.3.

"Permitted Equity Interest Transfer" means:

(a) any Transfer of Equity Interests, in Tenant, provided that Guarantor shall continue to own, directly or indirectly, 100% of the Equity Interests in Tenant, or

(b) any Transfer of Equity Interests in Guarantor, or other corporate reorganization, consolidation or merger of Guarantor or of any holder of Equity Interests in Guarantor, provided that:

(1) Except in the case of a Transfer of Publicly-Traded Equity Interests, if the transferee, together with its Affiliates, will own 20% or more of the Equity Interests in Guarantor (and therefore, indirectly, 20% or more of the Equity Interests in Tenant) following such Transfer (and, prior to such transfer, held less than 20% of such Equity Interests), Tenant shall, not less than 5 Business Days after the date of such Transfer, certify to Landlord that it has performed background checks for such transferee using the Prohibited Person Vetting

17

Process and, subject to the Prohibited Person Determination Standards, has determined that such transferee is not a Prohibited Person; and

(2)     Guarantor, or a replacement guarantor, shall thereupon have a net worth of not less than $500,000,000, subject to Annual Escalation.

(c) a Transfer of Equity Interests in Guarantor or Tenant in order to effect the sale or other transfer of all or substantially all of the shopping centers owned, directly or indirectly by Guarantor, provided that Guarantor, or a replacement guarantor, shall thereupon have a net worth of not less than $500,000,000, subject to Annual Escalation.

"Permitted Retail Use" has the meaning set forth in Section 5.1.

"Person" means any association, corporation, government, individual, joint venture, joint-stock company, limited liability company, partnership (of any type), trust, unincorporated organization, or other entity of any kind.

"Pertinent Grant Management Requirements" means the FTA requirements, set forth in Chapter IV of the Circular FTA C 5010.1D dated November 1, 2008, that are not crossed-out on **Exhibit O** attached hereto, it being understood and agreed that, as between Landlord and Tenant, Tenant shall have no obligation to take any actions or otherwise comply with the provisions of Chapter IV of such circular that are crossed-out on **Exhibit O**.

"Plans and Specifications" means, for any Construction, the plans and specifications therefor as they may be modified from time to time, which plans and specifications shall, to the extent required by this Lease and/or by applicable Law in order to obtain any required Approval, be prepared by an Architect and submitted to Landlord in such machine-readable format as is then customary in the architectural profession.

"Pre-Existing Environmental Conditions" has the meaning set forth in Section 12.3.

"Premises" has the meaning set forth in the Recitals.

"Prime Rate" means the prime rate or equivalent "base" or "reference" rate for corporate loans that is from time to time (a) published in the Wall Street Journal; or (b) if such rate is no longer so published, such rate as announced by any large United States "money center" commercial bank Tenant designates; or (c) if such rate is no longer so announced, then a reasonably equivalent rate published by an authoritative third party that Landlord reasonably designates.

"Prohibited Lien" means any mechanic's, vendor's, laborer's, or material supplier's statutory lien or other similar lien that (a) arises from work, labor, services, equipment, or materials supplied, or claimed to have been supplied, to Tenant or any Subtenant (or anyone claiming through either) and (b) attaches (or may attach upon termination of this Lease) to any portion of the Fulton Center.    An Equipment Lien on Tenant/Subtenant Equipment or Tenant/Subtenant FF&E shall not be deemed to constitute a Prohibited Lien.

18

"Prohibited Person" shall mean any Vettable Person for which any matter described in paragraphs (a) – (f) below applies and (i) Tenant's general manager of the Premises, assistant general manager of the Premises or leasing director of the Premises has actual knowledge at the time of such vetting that such Vettable Person is a Prohibited Person, (ii) any Senior Officer of Tenant, based upon actual knowledge of the Vettable Transaction and such Vettable Person, knows, or ought to know, that such Vettable Person is a Prohibited Person in the context of such transaction and this Lease, or (iii) such matter is disclosed to Tenant at the time Tenant performs background checks for such Vettable Person using the Prohibited Person Vetting Process for such Person in accordance with this Lease and subject to the Prohibited Person Determination Standards:

(a)     such Vettable Person or any Affiliate thereof is in monetary default or in breach of any non-monetary obligation under any written agreement with the State (including Landlord) or the City of New York after notice and beyond any applicable cure periods, unless, in each instance, such monetary default or breach either (i) has been waived in writing by the State or City of New York, (ii) is being disputed in a court of law, administrative proceeding, arbitration or other similar forum, (iii) is cured within 30 days after a determination and notice to Tenant from Landlord that such Vettable Person is a Prohibited Person as a result of such default or breach, or (iv) is in connection with a payment default under a mortgage loan that is either recourse or non-recourse to a single purpose entity borrower and issued by an agency or authority for the State or City of New York other than Landlord or its subsidiaries;

(b)     such Vettable Person (i) is an organized crime figure or is reputed to have substantial business or other affiliations with an organized crime figure, or (ii) has had in the 10 years preceding the date of the proposed Vettable Transaction a contract terminated by any government agency for breach of contract or for any cause directly or indirectly related to an indictment or conviction;

(c)     such Vettable Person (i) has been convicted in the 10 years preceding the date of the proposed Vettable Transaction of a felony in which such Vettable Person committed a violent crime, fraud or tax evasion, or (ii) is a registered sex offender;

(d)     such Vettable Person (i) has been convicted of a felony under any Anti-Money Laundering and Anti-Terrorism Laws; (ii) is in violation of any Anti-Money Laundering and Anti-Terrorism Laws; or (iii) is on a list maintained by OFAC;

(e)     such Vettable Person is a government, or is an entity owned by a government, that the United States has finally determined to be in violation of the Export Administration Act of 1979, as amended, or any successor statute, or the regulations issued pursuant thereto, or subject to the regulations or controls thereof; or

(f)     such Vettable Person is a government, or is an entity owned by a government, that is subject to the Trading with the Enemy Act of 1917, as amended, or the regulations of the United States Treasury Department or executive orders of the President of the United States of America issued pursuant thereto.

23958769v39

As of the Lease Execution Date, clause (e) refers only to the governments listed by the United States Treasury Department as participating in the Arab League boycott of Israel, which are the governments of Iraq, Kuwait, Lebanon, Libya, Qatar, Saudi Arabia, Syria, the United Arab Emirates and Yemen, and their government-owned companies. As of the Lease Execution Date, clause (f) refers to the government of Cuba only, and Cuba's government-owned companies.

"Prohibited Person Determination Standards" has the meaning set forth in Section 6.5.

"Prohibited Person Vetting Process" has the meaning set forth in Section 6.5 and **Exhibit S**.

"Prohibited Uses" has the meaning set forth in **Exhibit M.**

"Property Insurance" means any and all property insurance required by Section 14.1.

"Property Insurance Proceeds" means net proceeds (after reasonable costs of adjustment and collection, including Legal Costs) of Property Insurance, when and as received by Landlord or Tenant, excluding proceeds of business interruption insurance. If Landlord self-insures all or any portion of its Property Insurance requirements, then Property Insurance Proceeds shall include the deductible under, and any other amount that Landlord would have received from, its Property Insurance had it satisfied such requirements through the purchase of insurance policies rather than by self-insurance.

"Public Circulation Areas" means, collectively, the Paid Public Circulation Areas and the Unpaid Public Circulation Areas.

"Publicly-Traded Equity Interest" means an Equity Interest that is traded on a public, government-regulated exchange.

"Public Person" means any Person some or all of the Equity Interests in which are Publicly-Traded Equity Interests.

"R Line Platform" has the meaning set forth in the Recitals.

"R Line Underpass" has the meaning set forth in the Recitals.

"Reading Room" means the Christian Science Reading Room Tri-State Committee, Inc.

"Reading Room Agreement" means that certain agreement by and between Metropolitan Transportation Authority and Reading Room, dated as of April 27, 2005, whereby the Reading Room has been afforded the opportunity to lease a portion of the ground floor of the Corbin Building, as more particularly described therein, which Reading Room Agreement shall be assigned to Tenant as of the Lease Execution Date, as hereinafter provided.

"Real Property Tax" means New York City imposed ad valorem real property tax payable pursuant to the Real Property Tax Law or any successor thereto.

"Recalculated Participation Rent" has the meaning set forth in Section 4.7.

"Recalculated 1st Level Participation Rent" has the meaning set forth in **Exhibit V**.

"Recalculated 2nd Level Participation Rent" has the meaning set forth in **Exhibit V**.

"Recalculated Signage Participation Rent" has the meaning set forth in **Exhibit V**.

"Records Request" has the meaning set forth in Section 4.7.3.

"Remaining Useful Life Cost" has the meaning set forth in Section 7.1.3.

"Renewal Option" has the meaning set forth in Section 2.3.

"Renewal Term" has the meaning set forth in Section 2.3.

"Renewal Exercise Notice" has the meaning set forth in Section 2.3.

"Rent" means Participation Rent and Additional Rent and, during any Renewal Term, Guaranteed Minimum Rent, all of which will be payable as hereinafter provided.

"Required Bond Improvement" has the meaning set forth in Section 8.4.1.

"Restoration" means restoring and/or repairing Improvements after a Loss.

"Restoration Funds" means any Loss Proceeds to be applied to Restoration.

"Restore" means undertake a Restoration.

"Retail Standard" has the meaning set forth in Section 5.1.

"Retail Usage Area" means that portion of the Commercial Usage Areas that may be used for the Permitted Retail Use only. The Retail Usage Areas encompass the entirety of the Commercial Usage Areas excluding all floors in the Corbin Building above the ground floor. RMUs, but not areas around RMUs, shall be deemed to be part of the Retail Usage Area, notwithstanding that they are located within Public Circulation Areas. The area around each RMU shall be deemed to be part of the Public Circulation Areas.

"RMU" means a mobile cart, kiosk, retail merchandising unit or other similar mobile retail outlet.

"Scheduled Expiration Date" means, as of any point in time, the last day of the Term as it may theretofore have been extended in accordance with this Lease.

"Senior Officer" means, in the case of (a) a Transaction Party, the president, chief executive officer, executive vice president, chief financial officer, chief operating officer, general counsel or equivalent titles or a Principal of such Transaction Party, and (b) Tenant, the president, chief executive officer, executive vice president, chief financial officer, chief operating officer, general counsel or equivalent titles of Guarantor or a parent company of Guarantor.

"Signage Capital Expenditures" means, at any time, aggregate gross Capital Expenditures theretofore made by Tenant for the acquisition, repair, replacement or installation of Tenant Controlled Signage. For purposes of calculating Signage Participation Rent, Signage Capital Expenditures shall not be capitalized over the useful life of the improvements thereby funded but shall be treated as expenses when made.

"Signage Locations" has the meaning set forth in the Recitals.

"Signage Participation Rent" has the meaning set forth in Section 4.1.2(c).

"Signage Revenues" means all revenues of Tenant (or any Affiliate of Tenant) attributable to the Tenant Controlled Signage, including any proceeds of business interruption insurance or any Condemnation Award relating to the Tenant Controlled Signage, but excluding (a) any such revenues refunded by Tenant (or such Affiliate) to a party paying for the use of the Tenant Controlled Signage, and (b) any state or city sales, excise, gross receipt or similar taxes now or hereafter collected and paid by Tenant (or such Affiliate) on account of such revenues.

"Special Purpose Entity Covenants" has the meaning set forth in **Exhibit H**.

"Sponsorship Net Revenues" means, for any period, the Sponsorship Revenues attributable to Sponsorship Events during such period, *less* all expenses incurred by Tenant in connection with such Sponsorship Events, without duplication of any Tenant O & M Expenses.

"Sponsorship Participation Rent" has the meaning set forth in Section 4.3.

"Sponsorship Events" means any marketing or other sponsorship events, (including live broadcasts, webcasts and/or film shoots) that may be authorized by Landlord and Tenant to take place in the Public Circulation Areas.

"Sponsorship Revenues" means all revenues of Tenant (or any Affiliate of Tenant) attributable to Sponsorship Events, excluding Signage Revenues, and excluding (a) any such revenues refunded by Tenant (or such Affiliate) to a party paying for a Sponsorship Event, and (b) any state or city sales, excise, gross receipt or similar taxes now or hereafter collected and paid by Tenant (or such Affiliate) on account of such revenues.

"Stabilization Conditions" has the meaning set forth in **Exhibit Q.**

"Stabilization Period" has the meaning set forth in Section 2.1.

"Stabilization Period Operating Deficit" means the amount, if any, by which (a) the Tenant O & M Expenses for the period commencing on the Opening Date and ending on the

Break-Even Date exceed (b) the Commercial Revenues for such period. The Stabilization Period Operating Deficit shall not be subject to adjustment by reason of the Commercial Revenues for the remainder of the Stabilization Period exceeding the Tenant O & M Expenses for such remainder period. Notwithstanding the foregoing, if the Opening Date occurs after August 1, 2014, then the Stabilization Period Operating Deficit shall also include any Tenant O & M Expenses for operating the Corbin Building from August 1, 2014 to the Opening Date.

"Stabilization Period Operating Deficit Net Accrual" means, at any time, the aggregate Stabilization Period Operating Deficit accrued at such time, together with interest on the un-recouped balance thereof accruing at 10% per annum, compounded annually, *less* the amount theretofore or concurrently therewith credited against Rent on account thereof.

"State" means New York State.

"Structural Components" means the following elements of the Core and Shell/Base Building Improvements: (a) footings, foundations, floors and roof slabs, load-bearing walls, structural steel and other structural support systems of the Fulton Building, Corbin Building, Dey Street Headhouse, Dey Street Concourse, R line Underpass and 4/5 Line Underpass, (b) the structural (as opposed to architectural or mechanical) elements of stairways and escalators and (c) the extraordinary glass elements of the exterior shell and atrium of the Fulton Building (including the roof but excluding storefronts, doors and street-level windows). Windows, roofing materials and exterior cladding and finishes shall not be deemed to be "Structural Components" except as expressly provided in the preceding sentence.

"Sublease" means any sublease, license or other occupancy agreement pursuant to which Tenant permits a Person to use and occupy a portion of the Premises.

"Sublet Premises" means any portion of the Premises sublet by Tenant to any Subtenant pursuant to any Sublease made and entered into in accordance with Article 9.

"Submission Period" has the meaning set forth in Section 4.7.3.

"Substantial Casualty" means a Casualty (a) that damages or destroys 50% or more of the Retail Usage Area; (b) that causes such material damage to major Structural Components, and/or to the historic fabric of the Corbin Building, that Landlord reasonably determines it to be impracticable to rebuild the Premises substantially as they were prior to such Casualty and/or elects to close the Dey Street Concourse permanently or on an indefinite, long-term basis and/or to demolish substantially all of the Corbin Building or the exterior "cube" and/or the interior "donut" comprising the principal above-ground portions of the Fulton Building; (c) for which Restoration of the Premises to the same use as existed prior to such Casualty is prohibited by Law; or (d) for which Restoration of the Core and Shell/Base Building Improvements will require not less than two years from the date of such Casualty, as reasonably estimated by an architect selected by Landlord and subject to Tenant's approval, not to be unreasonably withheld.

"Substantial Completion" or "Substantially Complete" has the meaning provided on **Exhibit Q**.

23958769v39

"Substantial Condemnation" means any Condemnation that (a) takes the entire Premises, (b) in Tenant's reasonable determination renders the remaining Premises economically unviable or (c) occurs during the last two years of the Term.

"Subtenant" means any Person entitled to occupy, use and possess any portion of the Premises under a Sublease, including any Person operating an RMU.

"Subtenant Improvements" means, for any Sublet Premises, the Improvements to such premises, other than Core and Shell/Base Building Improvements, that shall be necessary for the Subtenant thereof to open such premises to the general public for the conduct of its business, and any other Improvements that may thereafter be made by such Subtenant.

"Subtenant-Related Liability Claim" has the meaning set forth in Section 13.4.

"Subway Street Level Entrances" has the meaning set forth in the Recitals.

"Target Opening Date" means June 26, 2014.

"Temporary Condemnation" means a Condemnation of the temporary right to use or occupy all or part of the Premises.

"Tenant" has the meaning set forth in the Preamble.

"Tenant Commercial Liability Expenses" means, as of the date of determination, the aggregate amount paid by Tenant from the Opening Date to the date of determination for (a) 85% of the premiums charged to Tenant for its (but not to Subtenants or contractors for their) commercial general liability insurance policies for the Premises (the remaining 15% of such premiums being "Tenant's GCL Premium Share"), *plus* (b) the deductibles/self-insured retention under such policies to the extent Tenant (or a third-party claims administrator retained to handle third party claims on behalf of Tenant and its liability insurer) has made payments to third-party claimants or incurred Legal Costs (which Legal Costs, under the commercial general liability policy described in Section 14.2(b) are applied against such deductibles/self-insured retention), excluding, however, any deductibles/self-insured retention to the extent paid or used for any claim in which Tenant or any of its Affiliates or their respective employees or agents is found by a court of competent jurisdiction or by an arbitrator in accordance with the procedures set forth in Article 23 to have committed gross negligence or willful misconduct (such excluded payments being referred to as "Excluded Commercial Liability Expenses"), *plus* (c) for each third-party claim under such policies, the administrative fee charged by such third-party claims administrator, *less* (d) the sum of (i) any amounts recovered by Tenant from a contractor hired by Tenant or its liability insurer on account of the possible liability of such party, which recovery itself shall be net of any unreimbursed Legal Costs incurred by Tenant in obtaining such recovery and (ii) any amounts recoverable by Tenant from a Subtenant or its liability insurer (given the indemnification obligations of such Subtenant as described in Section 13.4) or attributable solely to the performance by Tenant of work in the Commercial Usage Areas.

23958760v39

"Tenant Commercial Liability Expense Net Accrual" means, as of the date of determination, the Tenant Commercial Liability Expenses *less* the amount of Tenant Commercial Liability Expenses theretofore or concurrently therewith credited against Rent.

"Tenant Controlled Signage" has the meaning set forth in the Recitals and **Exhibits C** and **C-1**.

"Tenant Curable Material Structural Failure" has the meaning set forth in Section 7.2.1.

"Tenant Gross Negligence" means the gross negligence or willful misconduct of Tenant or any of its Affiliates or their respective employees or agents in connection with the use, occupancy, control, management, operations or possession of the Premises.

"Tenant Indemnitees" means Tenant, Subtenants, their respective Affiliates and their respective directors, officers and employees.

"Tenant O & M Expenses" means, for any period, the expenses (but not Initial Capital Expenditures or Ongoing Capital Expenditures) incurred by Tenant in respect of its operation and maintenance of the Premises, excluding (i) expenses relating to the Tenant-Controlled Signage and/or Sponsorship Events, (ii) expenses attributable to Tenant's gross (as distinguished from ordinary) negligence or willful misconduct, (iii) except as provided in clause (o) below, any off-site costs of services performed for the Premises at home or regional offices of Tenant's Affiliates, (iv) any corporate "overhead" expenses incurred by or on behalf of Tenant, including overhead expenses for maintaining, staffing and operating any office of Tenant's Affiliates located in office space within the Corbin Building, (v) Tenant Commercial Liability Expenses, and (vi) Excluded Commercial Liability Expenses.   Subject to such limitations, Tenant O & M Expenses shall include the following:

(a)   Impositions;

(b)   sales taxes paid with respect to goods or services benefiting the Premises, exclusive of sales taxes collected from third parties;

(c)   charges for gas, electricity and other utilities supplied to the Premises (except to the extent such charges are paid for by Landlord without reimbursement by Tenant or directly by Subtenants to the applicable utility providers), and the disposal of all garbage and refuse from the Premises (except to the extent such charges are paid for directly by Subtenants to the applicable service providers);

(d)   expenses of operating, leasing, maintaining, repairing, replacing and cleaning all areas of the Premises (except to the extent such charges are paid for directly by Subtenants to the applicable service providers), including the salaries, wages, benefits and other costs of all on-site employees at the Premises employed by Tenant or its Affiliates;

(e)   expenses of operating, maintaining and repairing the Non-Structural Components (except to the extent borne directly by Subtenants);

(f)     a management fee equal to 2 1/2 % of Commercial Revenues;

(g)     fees and charges incurred in connection with the opening, maintenance and operation of any bank accounts for the Premises or Tenant;

(h)     advertising, marketing and promotional expenses relating to the Premises;

(i)     the fees of attorneys and other consultants engaged in connection with operation and maintenance of the Premises;

(j)     Tenant's GCL Premium Share;

(k)     expenses incurred in connection with equipment needed for purposes of the operation and maintenance of the Premises, including any financing, leasing or other charges reasonably incurred in respect of such equipment and any legal or other expenses associated with the arranging thereof;

(l)     charitable donations made by Tenant from time to time after the Break-Even Date  in furtherance of its operations at the Premises;

(m)     third party audit and accountancy fees incurred in connection with the preparation of any accounts or financial statements relating to the Premises and prepared by or on behalf of Tenant for the purpose of providing required financial information to Landlord;

(n)     expenses incurred in (x) complying with Law and Insurance Requirements applicable to the Premises, Tenant or Subtenants; and (y) enforcing compliance with Law and Insurance Requirements binding on Subtenants, contractors or consultants; and

(o)     subject to Landlord's approval, which shall not be unreasonably withheld or delayed, an allocable portion of those personnel employed by Tenant or its Affiliates who are dedicated to working solely on Westfield World Trade Center and the Premises and whose services related to the Premises is work that is customarily performed by on-site personnel, which allocable portion shall reflect the approximate percentage of time each employee spends performing services specifically related to the Premises.

"Tenant-Ready Condition" means, with respect to the Commercial Usage Areas, excluding the RMUs, that the requirements set forth in Appendix A to **Exhibit L** (the Design Guidelines) have been satisfied in all material respects.

"Tenant Recklessness" means (a) a deliberate act by Tenant the purpose of which is to damage the Premises, (b) a deliberate act by Tenant, without justification and  in reckless disregard of knowledge that such  action would be likely to cause significant damage to the Premises, or (c) a persistent and deliberate failure of Tenant to comply with maintenance guidelines for particular  Core and Shell/Base Building Improvements with knowledge that such persistent failure creates a significant risk of resulting material damage to such Core and Shell/Base Building Improvements.

26

"Tenant's GCL Premium Share" has the meaning set forth in the definition of Tenant Commercial Liability Expenses.

"Tenant/Subtenant Equipment" means any and all fixtures or equipment incorporated in any Sublet Premises by Tenant or any Subtenant, at Tenant's or such Subtenant's cost, and used, useful or necessary to operate such Sublet Premises. Tenant/Subtenant Equipment shall exclude Tenant/Subtenant FF&E and shall, subject to Section 24, become the property of Landlord upon the expiration or earlier termination of this Lease.

"Tenant/Subtenant FF&E" means all movable furniture, furnishings, equipment, and personal property of Tenant or any Subtenant that may be removed without material damage to the Premises and without adversely affecting:  (a) the Structural Components; (b) the Base Building Equipment or any Tenant/Subtenant Equipment or the present or future operation thereof;  or  (c) the present or future provision of any utility service to the Premises. Tenant/Subtenant FF&E shall include items such as merchandise, signs, goods, trade fixtures, factory equipment, furniture, movable equipment, telephone, telecommunications and facsimile transmission equipment, point of sale equipment, televisions, radios, network racks, and computer systems and peripherals.

"Term" means the Initial Term, as such term may be extended by Tenant's valid exercise of the First Renewal Option and the Second Renewal Option.

"Third Party Areas" has the meaning set forth in the Recitals.

"Third-Party Liability Claims" has the meaning set forth in Section 13.1.

"Trade Name" means the trade name of the Commercial Usage Areas.

"Transfer" means, (a) with respect to this Lease and the Leasehold Estate, any assignment, conveyance, mortgage, hypothecation, sale or other transfer of this Lease, the Leasehold Estate, or any portion thereof, including the grant of any mortgage, easement, lien, or other encumbrance on this Lease or the Leasehold Estate, whether by operation of law or otherwise, whether voluntary or involuntary; and (b) with respect to Equity Interests in Tenant or Guarantor, any conversion, exchange, issuance, sale, or other transfer of such Equity Interests. For the avoidance of doubt, a Sublease (other than a master sublease) shall not be deemed to be a Transfer.

"Unavoidable Delay" means delay in performing any obligation under this Lease, except payment of money, arising from or on account of any cause whatsoever beyond the performing Party's reasonable control, despite such Party's reasonably diligent efforts, including strikes, labor troubles or other union activities, such Party's inability to obtain required labor or materials after commercially reasonable efforts to do so, Loss, accidents, changes in Laws, governmental preemption, war, riots, terrorism, threats of terrorism, NYPD or MTA Police Department activity or other acts of a Government authority, extreme weather conditions, or a delay in issuing a necessary permit beyond the normal period for processing such permit. Unavoidable Delay shall exclude delay caused by such Party's financial condition, illiquidity, or insolvency.  A Party claiming Unavoidable Delay shall notify the other Party (a) within 30 days

23958769v39

after such Party knows of any such Unavoidable Delay; and (b) within 10 days after such Unavoidable Delay ceases to exist.   To be effective, any such notice must describe the Unavoidable Delay in reasonable detail.   The performance of a nonmonetary obligation that is affected by Unavoidable Delay shall extend the time for such performance only by the number of days by which such Unavoidable Delay actually delayed such performance.

"Unpaid Public Circulation Areas" means the areas of the Premises identified on the Usage Plans as "Unpaid Public Circulation."

"Unrecovered Signage Capital Expenditures" means, at any time, the aggregate Signage Capital Expenditures theretofore made *less* Signage Revenues applied pursuant to Sections 4.1.1(a) or 4.1.2(a).

"Usage Plans" has the meaning set forth in the Recitals and **Exhibit B**.

"Useful Life" has the meaning set forth in Section 7.1.3.

"Usury Limit" means the highest rate of interest, if any, that Law allows under the circumstances.

"Vettable Person" means (a) (i) any prospective Subtenant, (ii) any prospective vendor under consideration by Tenant to provide services to Tenant at the Premises on a regular basis pursuant to a contract with Tenant or its Affiliates valued at more than $100,000 per annum (subject to Annual Escalation) or pursuant to a renewal of any such contract, (iii) any prospective construction contractor under consideration to construct improvements or alterations at the Premises pursuant to a contract with Tenant or its Affiliates valued at more than $100,000 (subject to Annual Escalation), or (iv) any prospective transferee of Equity Interests in Tenant or Guarantor under clause (b) of the definition of Permitted Equity Interest Transfer, and (b) for each non-Public Person in the preceding clause (a) that is not a government-owned company, the controlling owner(s) of such Person as disclosed by such Person to Tenant.

"Vettable Transaction" means (a) a Sublease, (b) a contract with Tenant or any Affiliate of Tenant valued at more than $100,000 per annum (subject to Annual Escalation) to provide services to Tenant at the Premises on a regular basis pursuant to a contract with Tenant or its Affiliates, or a renewal of any such contract, (c) a contract with Tenant or any Affiliate of Tenant valued at more than $100,000 (subject to Annual Escalation) to construct improvements or alterations at the Premises, or (d) an agreement to Transfer Equity Interests in Tenant or Guarantor pursuant to clause (b) of the definition of Permitted Equity Interest Transfer.

"Warranty" means either a Construction Warranty or the E&O Policy, as applicable.

23958769v39

2.      *Term.*

2.1     *Stabilization Period.* The "Stabilization Period" is the portion of the Term ending on the 24th full calendar month after the latest of (a) the Opening Date, (b) the date on which all of the Stabilization Conditions have been satisfied and (c) the Interim Delivery Date.

2.2     *Initial Term.* The initial term of this Lease (the "Initial Term") shall (a) commence upon the Substantial Completion of Landlord's Work; and (b) end on the 20th anniversary of the later of (x) the date on which all of the Stabilization Conditions have been satisfied, and (y) the earlier of (i) the last day of the Stabilization Period, and (ii) the day Subtenants occupying not less than 80% of the Commercial Usage Areas are open to the public for the conduct of their respective businesses (such 20th anniversary date being the "Scheduled Expiration Date"), unless terminated sooner in accordance with the provisions of this Lease.

2.3     *Renewal Options.* Provided that Tenant is in full compliance with all the material terms and conditions of this Lease at the time Tenant gives a Renewal Exercise Notice, Tenant shall have the right and option (each, a "Renewal Option," the first of which being the "First Renewal Option" and the second of which being the "Second Renewal Option") to extend and renew this Lease upon all the same terms and conditions, except as this Lease otherwise expressly states, for two additional successive periods of 10 years each (each, a "Renewal Term," the first of which being the "First Renewal Term" and the second of which being the "Second Renewal Term") after the Initial Term expires. Tenant shall exercise each Renewal Option, if at all, by giving Landlord notice of such exercise (a "Renewal Exercise Notice") not less than 24 months before the first day of the corresponding Renewal Term. Within 10 days after Landlord acknowledges in writing that Tenant has satisfied all conditions to the effectiveness of Tenant's exercise of a Renewal Option, Tenant shall pay Landlord the applicable Capital Expenditure Offset Reimbursement determined pursuant to Section 7.1.4, if any. After the Second Renewal Term, Tenant shall have no further right to renew or extend the Term. If Tenant exercises the First Renewal Option, then the Scheduled Expiration Date will be extended by 10 years, and if Tenant exercises the Second Renewal Option, then the Scheduled Expiration Date will be extended by an additional 10 years. If Tenant fails to validly and timely exercise the First Renewal Option, then the Second Renewal Option shall terminate.

3.      *Landlord's Work; Delivery of Premises; Tenant Controlled Signage.*

3.1     *Landlord's Work.* To the extent not yet completed as of the Lease Execution Date, Landlord shall diligently and in good faith pursue Substantial Completion and thereafter Final Completion of Landlord's Work. Landlord shall give Tenant reasonable advance notice of key milestones with respect to such work (including testing and acceptance of Base Building Equipment, and determinations with respect to Substantial Completion and punchlist items), and Landlord and Tenant shall conduct joint inspections of such work. Landlord shall arrange for Tenant to participate, and Tenant shall participate, in the commissioning of the Core and Shell/Base Building Improvements so that Tenant's personnel are appropriately trained in the proper maintenance and operation thereof. Not less than seven days prior to the commissioning of any Base Building Equipment and in any event not less than seven days prior to the Applicable Delivery Date for the portion of the Premises in which any Base Building Equipment is located, Landlord shall deliver to Tenant the O&M Manual for such equipment.

23958789v39

Within seven days after the commissioning of any Base Building Equipment, Landlord shall deliver to Tenant test results from such commissioning. Landlord shall notify Tenant when it believes that it has achieved Substantial Completion and Tenant shall thereafter have five Business Days to inspect the Premises to confirm that Substantial Completion has been achieved and to confirm the punchlist with respect thereto based on a joint inspection. The punchlist items shall have no material adverse effect upon Tenant's use of the Premises or the construction of Subtenant Improvements hereunder, and, in any event, shall be reasonably promptly completed by, or on behalf of, Landlord.   If Tenant fails to timely inspect and notify Landlord of any dispute as to the Substantial Completion or the punchlist with respect thereto, then Tenant shall be deemed to have waived same, and Substantial Completion shall be deemed to occur on the date designated by Landlord by notice to Tenant. Upon completion of the punchlist items and satisfaction of the other conditions to Final Completion of Landlord's Work, Landlord shall notify Tenant and  Tenant shall have five Business Days after the date of such notice to inspect the balance of the Premises to confirm that Final Completion, including completion of the punchlist items, has been achieved. In the event of any dispute between Landlord and Tenant as to whether Substantial Completion or Final Completion has occurred, such dispute shall be resolved by Arbitration, in a manner that shall be coordinated as well as reasonably possible with any related dispute resolution under the design and construction contracts for Landlord's Work. At Tenant's request, Landlord shall make any or all of Landlord's Construction Records available to Tenant.

      3.2     *Delivery of Commercial Usage Areas in Tenant-Ready Condition.* Landlord hereby delivers to Tenant, and Tenant hereby accepts, possession of the Corbin Building and the Retail Usage Areas within the Dey Street Headhouse, which Tenant acknowledges to be Substantially Complete and in Tenant-Ready Condition, subject to a punch list agreed to by Landlord and Tenant, and possession of the Retail Usage Areas within the Dey Street Concourse and the 4/5 Line Underpass, which Tenant acknowledges to be Substantially Complete, subject to a punch list agreed to by Landlord and Tenant. The Dey Street Concourse and the 4/5 Line Underpass shall not be open to the public until the Opening Date, and notwithstanding the delivery of possession of the Retail Usage Areas within the Dey Street Concourse and the 4/5 Line Underpass to Tenant on the Lease Execution Date, Tenant shall not have any operational responsibility for these areas until the Opening Date, as set forth in Sections 5.14. Landlord shall use commercially reasonable efforts to deliver to Tenant possession of the Retail Usage Areas (except for the RMUs) in the Fulton Building Substantially Complete and  in Tenant-Ready Condition as soon as reasonably possible after the Lease Execution Date, and in any event Landlord shall deliver such areas to Tenant Substantially Complete and in Tenant-Ready Condition by the Opening Date (the actual date of such delivery being the "Interim Delivery Date"). Landlord shall complete the finishes in the lobby areas on the second and third levels of the Fulton Building on or prior to September 30, 2014.  From and after the Lease Execution Date, Landlord shall keep Tenant regularly apprised of the status of construction of the Core and Shell/Base Building Improvements.  When Landlord believes the Tenant-Ready Condition for such Retail Usage Areas has been achieved Landlord shall give written notice to Tenant to that effect and concurrently therewith deliver to Tenant, for review, inspection and copying, Landlord's Construction Records for such areas to the extent then available. Following receipt of such notice, Tenant shall have five Business Days to inspect the Retail Usage Areas to confirm that Tenant-Ready Condition has been achieved (excluding any RMU locations, with

respect to which "Tenant-Ready Condition" does not apply) based on a joint inspection. If any work remains incomplete in order for such areas to achieve Tenant-Ready Condition, Landlord shall promptly complete such work and notify Tenant thereof. The provisions of the two preceding sentences shall reapply until Tenant agrees that such areas have achieved Tenant-Ready Condition.

3.3    *Entry by Tenant Prior to Interim Delivery Date.* Prior to the Interim Delivery Date, Landlord shall permit Tenant, prospective Subtenants, and Subtenants and their respective architects, consultants and contractors to enter the Commercial Usage Areas outside of the Corbin Building, solely for the purposes of inspecting and taking measurements and photographs of such areas. Any such entry shall be in accordance with Landlord's standard procedures and an agreed-upon access agreement.

3.4    *Entry by Tenant Between Applicable Delivery Date and Opening Date.* After the Lease Execution Date, Tenant and Subtenants shall have the right to construct Subtenant Improvements in the Corbin Building and in the Retail Usage Areas within the Dey Street Headhouse, the Dey Street Concourse and the 4/5 Line Underpass, and after the Interim Delivery Date, Tenant and Subtenants shall have the right to construct Subtenant Improvements in the Retail Usage Areas (except the RMUs) in the Fulton Building, subject to compliance with the requirements applicable to Construction as set forth in Article 8. Tenant shall pay for all utilities furnished to Tenant and Subtenants in connection with such Construction. With respect to electric power and natural gas, consumption by Tenant and Subtenants shall be measured by meters serving exclusively the Commercial Usage Areas. With respect to water consumption, for which there is no separate meter serving exclusively the Commercial Usage Areas, the Parties shall split the cost thereof based on the relative size of the affected areas compared to the balance of the Premises.

3.5    *Material Physical Impairment.* Landlord has not heretofore authorized or permitted, and shall not authorize or permit, any Material Physical Impairment without the prior written consent of Tenant, not to be unreasonably withheld.

3.6    *Opening Date.* Landlord shall endeavor in good faith to achieve Substantial Completion on or before the Target Opening Date. Prior to the Opening Date, in accordance with a timetable to be approved by Landlord and Tenant, which approval shall not be unreasonably withheld or delayed, Landlord and Tenant shall commence the transition process whereby the responsibility for operation and maintenance of the Base Building Equipment and other aspects of the Premises is shifted from Landlord to Tenant so that on the Opening Date such responsibility will have shifted entirely from Landlord to Tenant. Notwithstanding the foregoing, if the parties so agree, the opening of the Dey Street Concourse shall be delayed until the connection between the Dey Street Concourse and the World Trade Center transportation hub is open to the public.

3.7    *Tenant Controlled Signage.* **Exhibit C** sets forth, for each Tenant Controlled Sign, the location within the Premises (or the A/C Mezzanine West or A/C Mezzanine East) of such Tenant Controlled Sign, and **Exhibit C-1** sets forth the model and model number for the media player and other hardware comprising each Base Tenant Controlled Sign. Tenant shall have the right, in the exercise of its own discretion, to select the

31

manufacturer, model and model number of the Additional Tenant Controlled Signage so long as Tenant complies with the Design Guidelines applicable to such signage.

        3.7.1   As part of Landlord's Work, Landlord shall cause the Base Tenant Controlled Signs to be installed in accordance with **Exhibit C** and the applicable Core and Shell/Base Building Plans and Specifications with the objective of having such signs being fully operational prior to the Opening Date. Landlord shall be solely responsible for the cost of purchasing and installing the Base Tenant Controlled Signs, including the hardware and media player for each such sign, together with an industry-standard 7-year warranty from a third-party service provider or the manufacturer for each such sign.

        3.7.2   As part of Landlord's Work, Landlord shall complete the structural preparation for the Additional Tenant Controlled Signs in the Fulton Building at the locations set forth in **Exhibit C** by May 30, 2014 except for the "Super C" signs. So long as such structural preparation is completed by May 30, 2014, then prior to the Opening Date, Tenant shall install such Additional Tenant Controlled Signage, but if Tenant fails, for any reason, to complete such installation prior to the Opening Date, Tenant shall have the right to install such signage after the Opening Date, subject to coordinating such work with Landlord's Representative. With respect to the "Super C" signs, Tenant shall give Landlord four weeks' advance notice of their scheduled delivery date at the Premises, and Landlord shall complete the structural preparation for such signs within five days following the delivery of such signs at the Premises. Tenant shall perform all work (including any structural work) required to install the Additional Tenant Controlled Signage in the Dey Street Headhouse that is described in such exhibit. Insofar as such Additional Tenant Controlled Signage in the Fulton Building is concerned, the design and construction costs of such structural preparation shall be evenly split between Landlord and Tenant, and Tenant shall be solely responsible for the cost of such installation. Insofar as the Additional Tenant Controlled Signage in the Dey Street Headhouse is concerned, all costs shall be borne by Tenant. In each case, Tenant shall solely bear the cost of purchasing and installing the Additional Tenant Controlled Signs, including the hardware and media player for such signs, together with an industry-standard 7-year warranty from a third-party service provider or the manufacturer. Any amounts expended by Tenant on the acquisition and installation of, and/or structural preparation for, the Additional Tenant Controlled Signs (including the purchase of such product warranties) shall constitute Signage Capital Expenditures.

4.     *Rent*.

     4.1    *Rent Derived from Signage Revenues*.

        4.1.1   During the Term, subject to Section 4.5, Signage Revenues derived from Base Tenant Controlled Signage shall be applied on a monthly basis in the following order:

(a)      *First*, to Tenant until Tenant has received an amount equal to the Unrecovered Signage Capital Expenditures;

(b)      *Second*, to Tenant, until Tenant has received a 10% per annum return (compounded annually) on the balance from time to time of the Unrecovered Signage Capital Expenditures; and

(c)      *Third*, 70% of the balance of the Signage Revenues derived from Base Tenant Controlled Signage remaining after Sections 4.1.1(a) and (b) shall be paid to Landlord as Rent ("Base Signage Participation Rent").

4.1.2  During the Term, subject to Section 4.5, Signage Revenues derived from Additional Tenant Controlled Signage shall be applied on a monthly basis in the following order:

(a)      *First*, to Tenant until Tenant has received an amount equal to the Unrecovered Signage Capital Expenditures after taking into account any recovery by Tenant under Section 4.1.1(a);

(b)      *Second*, to Tenant, until Tenant has received a 10% per annum return (compounded annually) on the balance from time to time of the Unrecovered Signage Capital Expenditures after taking into account any recovery by Tenant under Section 4.1.1(b); and

(c)      *Third*, 65% of the balance of the Signage Revenues derived from the Additional Tenant Controlled Signage remaining after Sections 4.1.2(a) and (b) shall be paid to Landlord as Rent ("Additional Signage Participation Rent"; and together with Base Signage Participation Rent, "Signage Participation Rent").

4.1.3  *Payment Date.* Signage Participation Rent shall be paid monthly on or before the 30th day of the month with respect to the Signage Revenues collected by Tenant during the preceding month.

4.1.4  *Allocation of Signage Revenues.*  To the extent Signage Revenues are derived from "package deals" that include both Additional Tenant Controlled Signage and Base Tenant Controlled Signage, Tenant shall reasonably allocate such Signage Revenues between Additional Tenant Controlled Signage and Base Tenant Controlled Signage, taking into account non-packaged deals, for purposes of determining whether such revenues flow through Section 4.1.1 or 4.1.2.

4.1.5  *Signage Deals Involving Multiple Assets.*  Tenant shall not enter into signage "package deals" involving Tenant Controlled Signage and signage at other properties owned or managed by any Tenant Affiliate ("Multi-Property Package Deals") in which advertisers or sponsors are given a greater discount off of regular rates for Tenant Controlled Signage than for any such other properties unless Tenant holds Landlord harmless against the resulting reduction in Signage Revenues.

4.1.6   *Signage Deals with Tenants.*  Tenant shall not sell ad space on Tenant Controlled Signage to Subtenants, or to tenants of any Tenant Affiliate at the World Trade Center or elsewhere at rates for Tenant Controlled Signage that are more favorable to the advertiser or sponsor than would be in the absence of the advertiser's or sponsor's relationship with Tenant or its Affiliate unless Tenant holds Landlord harmless against the resulting reduction in Signage Revenues.

4.1.7   *Signage Deals in Connection With Sponsorship Events.* In any case where ad space on Tenant Controlled Signage is sold in connection with any Sponsorship Event, the allocation of the resulting aggregate revenues between Signage Revenues and Sponsorship Revenues shall be in proportion to how such revenues would be allocated if use of the Tenant Controlled Signage and the Sponsorship Event had been sold separately to the applicable advertiser or sponsor.

4.2   *Participation Rent Derived from Commercial Revenues.*  During the Term, Tenant shall pay Rent derived from Commercial Revenues in accordance with this Section 4.2.

4.2.1   *1st Level Participation Rent.*  On or before the January 31 following the end of each Lease Year, Tenant shall pay Landlord the following amount (the "1st Level Participation Rent") in respect of such Lease Year: 50% of the amount, if any, by which (a) Commercial Net Revenues for such Lease Year exceed (b) $3,500,000 ($3,500,000 being the "1st Level Initial Threshold").  Each annual payment of 1st Level Participation Rent shall be subject to a cap of $625,000 (the "1st Level Participation Rent Cap").  The 1st Level Initial Threshold and the 1st Level Participation Rent Cap are subject to Annual Escalation and shall be appropriately pro-rated in the case of any Lease Year of less than 12 months.  The 1st Level Participation Rent payment due January 31 shall be subject to adjustment and reconciliation based on the annual financial statements prepared and submitted by Tenant pursuant to Section 4.7.  Such 1st Level Participation Rent shall be subject to offset as provided in Section 4.5.

4.2.2   *2nd Level Participation Rent.*  In addition to paying the 1st Level Participation Rent, on or before the January 31 following the end of each Lease Year, Tenant shall pay Landlord the following amount (the "2nd Level Participation Rent") in respect of such Lease Year:  60% of the amount, if any, by which (a) Commercial Net Revenues for such Lease Year exceed (b) $4,750,000 ($4,750,000 being the "2nd Level Initial Threshold").  The 2nd Level Initial Threshold is subject to Annual Escalation and shall be appropriately pro-rated in the case of any Lease Year of less than 12 months.  The 2nd Level Participation Rent payment due January 31 shall be subject to adjustment and reconciliation based on the annual financial statements prepared and submitted by Tenant pursuant to Section 4.7.  Such 2nd Level Participation Rent shall be subject to offset as provided in Section 4.5.

4.3   *Rent Derived From Sponsorship Revenues.*  During the Term, Tenant shall pay to Landlord 50% of Sponsorship Net Revenues ("Sponsorship Participation Rent").  Sponsorship Participation Rent shall be paid monthly on or before the 30th day of the month with

respect to the Sponsorship Net Revenues collected by Tenant during the preceding month. Sponsorship Participation Rent shall be subject to offset as provided in Section 4.5.

4.4    *Guaranteed Minimum Rent During the Renewal Terms.*  As of the end of each month of each Lease Year of a Renewal Term, the Rent payable by Tenant for the elapsed portion of such Lease Year shall be the greater of (a) the Guaranteed Minimum Rent for the entire elapsed portion of such Lease Year as of the end of such month, as calculated below (referred to below as the "cumulative Guaranteed Minimum Rent"), and (b) the aggregate actual Participation Rent for the entire elapsed portion of such Lease Year as of the end of such month, as calculated pursuant to Sections 4.1 to 4.3 (referred to below as the "cumulative aggregate actual Participation Rent"). In determining whether the cumulative Guaranteed Minimum Rent at the end of any month is greater or less than the cumulative aggregate actual Participation Rent at the end of such month, the offset provided in Section 4.5 shall be disregarded.  If the cumulative aggregate actual Participation Rent at the end of any month exceeds the cumulative Guaranteed Minimum Rent at the end of such month, then Landlord shall be entitled to no further payment pursuant to this Section 4.4 at the end of such month.  If the cumulative Guaranteed Minimum Rent at the end of any month exceeds the cumulative aggregate actual Participation Rent at the end of such month, then Landlord shall be entitled to a payment for such month equal to the amount of such excess net of any prior Guaranteed Minimum Rent payments made for the same Lease Year.  The Guaranteed Minimum Rent Payment shall be calculated each month of each Lease Year of a Renewal Term as follows:

4.4.1    For each month (the "Applicable Month") of each Lease Year of a Renewal Term ("Applicable Lease Year"), the  "Guaranteed Minimum Rent" shall be the sum of the following amounts: (i) 80% of (A) the sum of the 1st Level Participation Rents, the 2nd Level Participation Rents and the Sponsorship Participation Rents, in each case determined without applying any Available Rent Offset, for the last two Lease Years prior to the commencement of such Renewal Term (such last two Lease Years being the "Comparison Years"), (B) divided by 24, *plus* (ii) the amount of Signage Participation Rent that would be payable for the Applicable Month if (A) the Signage Revenues derived from the Base Tenant Controlled Signage for such Applicable Month equaled 80% of (I) the Signage Revenues derived from the Base Tenant Controlled Signage for the two Comparison Years, (II) divided by 24, and (B) the Signage Revenues derived from the Additional Tenant Controlled Signage for such Applicable Month equaled 80% of (I) the Signage Revenues derived from the Additional Tenant Controlled Signage for the two Comparison Years, (II) divided by 24, in each case determined without taking into account any Available Rent Offset in such Comparison Years or any application of such revenues in such Comparison Years on account of any Unrecovered Signage Capital Expenditures or interest thereon as contemplated by Sections 4.1.1 or Section 4.2.1, *less* (iii) any Unrecovered Signage Capital Expenditures as of the Applicable Month and the requisite 10% return thereon.

4.4.2    For each month of each Lease Year of a Renewal Term, the Monthly Statement for such Lease Year submitted to Landlord pursuant to Section 4.7(a) shall include the cumulative Guaranteed Minimum Rent through the end of such month  and the determination of whether such cumulative Guaranteed Minimum Rent

is greater or less than the cumulative aggregate actual Participation Rent through the end of such month.

4.4.3    For each Lease Year of a Renewal Term, the Annual Statement for such Lease Year submitted to Landlord pursuant to Section 4.7(b) shall include the Guaranteed Minimum Rent for such Lease Year and the determination of whether such Guaranteed Minimum Rent is greater or less than the aggregate actual Participation Rent for such Lease Year, which comparison will be based on the Recalculated Participation Rent.

4.4.4    Concurrently with the submission of the Annual Statement for each Lease Year of a Renewal Term, the Guaranteed Minimum Rent payments for such year shall be reconciled with the excess, if any, of the Guaranteed Minimum Rent for such year over the aggregate actual Participation Rents for such year.  If the Guaranteed Minimum Rent payments for such year are greater than such excess, then Tenant shall be entitled to a credit to be applied against the next installment of monthly Participation Rent.  If the Guaranteed Minimum Rent payments for such year are less than such excess, then Tenant shall pay the deficiency within 30 days following submission of the Annual Statement.

4.4.5    A hypothetical illustration of the calculation of the Guaranteed Minimum Rent on an annual basis is set forth on **Exhibit W**.

4.5    *Offset.*    Tenant shall be entitled to a credit against the Participation Rent payable for any month equal to the Available Rent Offset as of the end of such month.  For the avoidance of doubt, the amount of the credit for any month under this Section 4.5 will not exceed the Rent payable for such month, so if the Available Rent Offset exceeds the Rent that would otherwise be payable for such month, then the amount of Rent payable to Landlord for such month would be $0 and such excess Available Rent Offset will carry over and be available for credit against Rent after such month. The Available Rent Offset shall not be applied against any Guaranteed Minimum Rent payment.

4.6    *Payment.*    Tenant shall pay Landlord the Rent without notice or demand, deduction, credit or set-off, except as specifically provided in this Lease, in lawful money of the United States of America, by  wire transfer,  pursuant, initially, to the following wire instructions:

> JPMorgan Chase Bank
> ABA # 021000021
> Account Name: MTA REAL ESTATE AND ADVERTISING REVENUE
> Account # 182532661
> Attn: Tim Noble

Landlord shall have the right to change such wire instructions from time to time upon reasonable prior notice to Tenant.

4.7    *Monthly Statements; Annual Statements; Reconciliation.*

23958769v39

(a)     *Monthly Statements.* Not later than the 30th day of each month during the Term after the Opening Date (including the 30th day of the month subsequent to the month during which the Expiration Date occurs), Tenant shall deliver, or cause to be delivered, to Landlord a true, correct and complete statement (each such statement, a "Monthly Statement") prepared, subject to the Arrearage Exception, on an accrual basis of accounting in accordance with GAAP and in a form from time to time reasonably acceptable to the Parties, showing each of the amounts set forth on **Exhibit V** for (a) the immediately preceding calendar month, and (b) the entire elapsed portion of the Lease Year, including the immediately preceding month. In accordance with the accrual basis of accounting, (i) Tenant shall treat rents and revenues owed by third-parties under Subleases or under agreements for use of Tenant Controlled Signage or from Sponsorship Events as having been paid during the month in which such rents and revenues are due and payable, even if such rents and revenues are not so paid, provided that if such rents and revenues remain unpaid for 90 days after the due date, then such unpaid rents and revenues will be written off as losses and the treatment of the corresponding rents and revenues, which were theretofore treated as having been paid, will be retroactively reversed; if such rents or revenues are thereafter paid, then they will be treated as having been paid in the month in which they are actually paid (this clause (i) is referred to as the "Arrearage Exception"); (ii) if the Subtenant under any Sublease pays "key money," then such key money shall be amortized on a straight-line basis over the initial term of such Subtenant's Sublease (so that, for each month during such term, the Commercial Revenues attributable to such Sublease shall be deemed to include the amount obtained by dividing the amount of the "key money" by the number of months in the term of such Sublease); and (iii) with respect to any Sublease with a Free Rent Period, the "free rent" afforded the applicable Subtenant shall be amortized on a straight-line basis over the initial term of such Subtenant's occupancy (so that, for each month between the first day of such Free Rent Period and the end of such initial term, the Commercial Revenues attributable to such Sublease shall be deemed to include the amount obtained by dividing the aggregate base rent payable by such Subtenant for the entirety of such term by the number of months in such term). Each Monthly Statement shall include a certification that Tenant has complied with Sections 4.1.5 to 4.1.7, identify any ad sales covered by such Monthly Statement to which such Sections apply, and specify how revenues were allocated in accordance with such Sections.

(b)     *Annual Statements.* Not later than 120 days after the close of each Lease Year (including any Lease Year ending on the Expiration Date), Tenant shall deliver, or cause to be delivered, to Landlord a true, correct and complete statement (each such statement, an "Annual Statement") in a form from time to time reasonably acceptable to the Parties showing each of the amounts set forth on **Exhibit V** for the entire preceding Lease Year. Each Annual Statement shall be certified by an independent certified public accountant and prepared on an accrual basis of accounting in accordance with GAAP, subject to the Arrearage Exception.

(c)     *Reconciliation.* If the aggregate amount paid by Tenant as Rent for a Lease Year is less than the aggregate Recalculated Signage Participation Rent, Recalculated Sponsorship Participation Rent and Recalculated Commercial Participation Rent (as each such term is defined on **Exhibit V** and collectively "Recalculated Participation Rent") for such Lease Year, then, simultaneously with the rendition of such statement, Tenant shall pay to Landlord the amount of such deficiency, and if such deficiency is 3% or more of the aggregate Rent for the

37

applicable Lease Year, then Tenant shall pay Default Interest on such deficiency from the midpoint of the applicable Lease Year until the date of payment of such deficiency. If the aggregate amount paid by Tenant as Rent for such Lease Year is greater than the Recalculated Participation Rent for such Lease Year, then Landlord shall credit the amount of such overpayment against the next monthly installments of Rent due. Any payment theretofore timely made by Tenant and any credit given by Landlord pursuant to this clause shall be without interest thereon except as provided in the first sentence of this paragraph. The acceptance by Landlord of payments of Rent or the acceptance by Landlord of Monthly Statements and Annual Statements shall be without prejudice to Landlord and shall in no event constitute a waiver of Landlord's right to claim a deficiency or to audit Tenant's books and records as provided herein. In addition, if Tenant selects the Break-Even Date retrospectively, then within 30 days after the Break-Even Date is selected, Tenant shall recalculate the Stabilization Period Operating Deficit and the Stabilization Period Operating Deficit Net Accrual based on the Break-Even Date, and Tenant shall further recalculate any Participation Rent for any prior periods based on the Stabilization Period Operating Deficit and the Stabilization Period Operating Deficit Net Accrual as recalculated. If Tenant owes any Participation Rent for any prior period on account of such recalculation, Tenant shall pay the deficiency with the next payment of Participation Rent, and if Tenant has overpaid any Participation Rent for any prior period, Tenant shall be entitled to a credit against future payments of Participation Rent.

4.7.1   Tenant shall pay, prior to delinquency, any and all Impositions and all federal, state and local sales, use, payroll and other similar taxes relating to its operations. Within 30 days following request by Landlord, Tenant shall deliver to Landlord a monthly statement itemizing such Impositions and payments made, and photocopies of the related tax returns filed by Tenant with the appropriate governmental authority.

4.7.2   Tenant shall prepare, keep and maintain at the Premises or at Tenant's principal office within the United States for a period of three years following the end of each Lease Year, complete and accurate books of account and records on an accrual basis in accordance with GAAP, subject to the Arrearage Exception (collectively, the "Performance Records"), in form and substance reasonably satisfactory to Landlord, of all Commercial Net Revenues, Sponsorship Net Revenues, Signage Revenues, Tenant O & M Expenses, Signage Capital Expenditures and other Capital Expenditures. Tenant shall have controls in place that are satisfactory to Landlord, in its reasonable judgment, to prevent the alteration or manipulation of such Performance Records. Supplementing the foregoing, the Performance Records for any particular period occurring during the Term (each, an "Audit Period") shall include all information recorded by Tenant that Landlord, in its reasonable judgment, deems pertinent to the determination of Signage Participation Rent, Sponsorship Participation Rent or Commercial Participation Rent for such Audit Period, including reasonably detailed records with respect to Multi-Property Package Deals. Landlord's right to review and audit the Performance Records under this Section 4.7.2 and Section 4.7.3 shall survive for three years after Tenant submits to Landlord the Annual Statements for such Lease Year and shall survive the Expiration Date for a period of three years with respect to the final Lease Year, two years with

respect to the penultimate Lease Year and one year with respect to the antepenultimate Lease Year, in each case the survival period running from the date of submission by Tenant to Landlord of the Annual Statements for the applicable Lease Year.

4.7.3   Subject to the time limitations contained in Section 4.7.2, Landlord (and its representatives) shall have the right, from time to time, to examine and/or cause a complete audit (and to make copies) of any or all Monthly Statements and Annual Statements and the Performance Records and Tenant's procedures for keeping such statements and records.  In connection with any such examination and/or audit, Landlord (or its representatives) shall have the right, from time to time, to request, in a written notice given to Tenant (each, a "Records Request"), that Tenant  make, or cause to be made, available to Landlord (or its representatives), at a location in New York City designated by Landlord, the Performance Records relating to any Audit Period.  Tenant, within 30 days after Tenant's receipt of any Records Request (each such 30-day period, a "Submission Period"), shall make, or cause to be made, available to Landlord (or its representatives) the Performance Records requested by Landlord in such Records Request.  If, with respect to any Records Request, Tenant fails to make, or cause to be made, available the Performance Records requested by such Records Request at the location designated by Landlord within the applicable Submission Period, then such failure (a "Performance Records Default")  shall constitute a material Nonmonetary Default hereunder (with respect to which Tenant shall be entitled to a notice and cure period pursuant to Section 22.1.4).  If the Performance Records made available by Tenant in response to such Records Request are insufficient to permit an accurate determination of the pertinent revenues and/or expenditures for the applicable Audit Period, then (a) Landlord shall identify the changes necessary to remedy such insufficiency, and (b) Tenant shall, within a reasonable period of time after such changes are identified, implement such changes and thereafter resubmit the applicable Performance Records to Landlord.  For purposes of this Section 4.7.3, the phrase "make available" or other words of similar import shall be deemed to require that Tenant make, or cause to be made, the Performance Records requested by any Records Request available to Landlord (or its representatives) either at the Premises or at Tenant's principal office within New York City.

4.7.4   Tenant shall pay, within 30 days following demand from Landlord, any additional Rent due Landlord as determined pursuant to any examination and/or audit of the Monthly Statements and Annual Statements, Performance Records and/or Tenant's procedures for keeping the same (together with Default Interest thereon from the midpoint of the calendar year that was examined or audited).  In addition, if any such audit discloses that the actual amount of Rent differs from the amount reported by more than 5%, then Tenant shall also pay the reasonable costs of such examination and/or audit as Additional Rent to Landlord within 30 days following rendition of a bill therefor.

23958769v39

4.7.5   Any dispute between the Parties about the calculation or determination of any component of Rent shall be subject to Arbitration, including any dispute arising from a year-end reconciliation or audit.

*4.8   Contracts with Affiliates.*   Notwithstanding any other provision of this Lease, Tenant shall not enter into a contract with an Affiliate of Tenant for the provision of materials or services if the payments thereunder are included in Capital Expenditures or Tenant O & M Expenses unless such contract is disclosed to Landlord and the economic terms thereof are not less favorable to Tenant than would be an arms' length contract between Tenant and a non-Affiliated third-party for the same materials or services.  Any such contract shall require the prior written consent of Landlord (not to be unreasonably withheld) to the extent, if any, that Tenant proposes to count payments thereunder for purposes of any Available Rent Offset against Signage Participation Rent.

*4.9   Additional Rent.*   In addition to Rent, Tenant shall pay Landlord (or the appropriate third party, as applicable) certain other charges, as herein elsewhere provided. Except where this Lease provides otherwise, Tenant shall pay all Additional Rent within 30 days after receipt of an invoice and reasonable supporting documentation.

5.   *Use.*

*5.1   Retail Standard.*   Tenant shall permit the use by Subtenants of the Retail Usage Area (including the RMUs) for high quality, lawful retail stores, food service establishments and/or restaurants (selling food and beverages for on and/or off Premises consumption) and for no other purpose (the "<u>Permitted Retail Use</u>").  Such use shall be of a quality commensurate with the standards of  the retail portions of other high quality transportation-oriented retail facilities in Manhattan such as, by way of example only, the retail portions of Rockefeller Center and Grand Central Terminal and the retail facilities at JFK International Airport Terminal 8 (the "<u>Comparable Facilities</u>"), taking into account the differing characteristics and operations appropriate to the below grade, street level and above street level portions of the Premises, and the operational and merchandising differences between RMUs and enclosed retail spaces (the "<u>Retail Standard</u>"), it being agreed also that the Retail Standard specifically excludes, on the street level of the Fulton Center and above, any so-called "chain" or "formula" restaurants having 10 or more other locations in the New York metropolitan area and that are required, by contract or otherwise, to maintain any of the following: standardized services, decor, uniforms, architecture, furniture, signage, or similar features (determined as of the time the applicable Sublease is entered into).  The use of the Retail Usage Area (including the RMUs) by Tenant and any Subtenants shall at all times comply with the Permitted Retail Use and shall (i) comply with the Design Guidelines, (ii) with respect to quality of products and operations of retail stores at each level within the Retail Usage Area, be commensurate with or better than the quality of products and operations of the retail stores included in the Comparison Stores for such level, (iii) with respect to the quality of food and service of food service establishments or restaurants at each level, be commensurate with or better than the quality of food and service of the food service establishments and restaurants included in the Comparison Stores for such level, and (iv) exclude uses on the list of "Prohibited Uses" attached hereto as **Exhibit M**, except as and to the extent Landlord's Director of Real Estate may otherwise permit in his or her sole and absolute discretion.  The list of retail stores, food service establishments

40

with respect to the Structural Components that are set forth in the Concept of Operations.   Tenant shall at its own cost repair any damage to the Structural Components to the extent such damage results directly from gross negligence or willful misconduct of Tenant or its contractors in performing (or failing to perform) such obligations, or to the extent such damage would have been prevented but for such gross negligence or willful misconduct.

      7.3      *Utilities*.   As part of Landlord's Work, Landlord shall arrange for the installation, to the extent set forth and in accordance with the Core and Shell/Base Building Plans and Specifications, of equipment required for the provision of gas, electric power, water, sewage, steam and telecommunications service to the Premises.  Tenant shall be responsible for making (or causing Subtenants to make) any and all improvements required to provide for the distribution of electrical or telecommunications services to RMUs and/or, to the extent not provided for in the Core and Shell/Base Building Plans and Specifications, for the distribution of utilities (and/or measurement of utility consumption by Subtenants) within the Commercial Usage Areas.  Landlord shall pay all charges for utilities consumed in the Premises, except for those consumed directly by Subtenants (including RMU operators) or by Tenant in providing HVAC or other services to the Commercial Usage Areas (exclusive of RMUs).  From and after the Applicable Delivery Date, Tenant shall pay (or cause Subtenants to pay) all charges for such utilities serving the Commercial Usage Areas, in accordance with **Exhibit R**.  Tenant shall make commercially reasonable efforts to conserve gas, electric power and water, without regard to the foregoing allocation of utility expenses.

      7.4      *Center Security.*

      (a)      Landlord shall (without thereby assuming liability for any injury or loss resulting from wrongful acts of persons not employed by Landlord or by any agent or contractor of Landlord) retain primary responsibility for endeavoring to maintain public safety and security at the Fulton Center.  In furtherance thereof, Landlord shall arrange for the provision of security services for the entire Premises, excluding only the Commercial Usage Areas, which service will provide both patrol and monitoring by security cameras in Landlord's reasonable discretion. Subject to Landlord's legal obligations, Landlord shall hire a private contractor, at Landlord's own cost and expense, to provide such security services; and Landlord shall, at Landlord's own cost and expense, also install and maintain such security cameras as it deems necessary for such purpose in the Public Circulation Areas and the Back of House Areas (with the express exclusion of Commercial Usage Areas of the Corbin Building).  Tenant shall have no responsibility for maintaining, repairing or operating such cameras or related equipment. Tenant may, at any time, request the addition of security cameras within the Public Circulation and Back of House areas. Landlord agrees that it will review and consider Tenant's request(s), but the determination as to whether to approve such request(s) shall be in the sole discretion of the Landlord.

      (b)      The security cameras and related equipment, which constitute Landlord Controlled Equipment, are used for two separate and independent systems, one for the NYPD monitoring network (the "NYPD Security System"), and the other for Fulton Center security use (the "Fulton Center Security System" or "FCSS").  Tenant may view FCSS live footage at any time from  (i) the room within the Fulton Building designated by Landlord for such purpose, (ii) Tenant's office at the Corbin Building, and (iii) the office of Tenant's Affiliate

at the World Trade Center, provided that the video feed is transmitted to such office at the World Trade Center by cable, the installation of which shall be the responsibility and cost of Tenant. Landlord shall retain all FCCS video footage for 45 days, and Tenant shall be able to obtain from Landlord a copy of video footage that is not older than 45 days promptly following submission to Landlord of a completed request form. Notwithstanding the preceding sentence, Tenant's request for a copy of particular footage may be subject to limitations or prohibitions on availability imposed by the NYPD, Federal Bureau of Investigation or other law enforcement agencies. FCCS video footage may contain sensitive information, and, accordingly, Tenant shall not distribute, transmit or otherwise disseminate any such video footage other than for a valid business rationale. Notwithstanding anything else contained in this provision, Tenant shall not make any such video footage available to the general public on the internet, and Tenant shall instruct any person to whom Tenant distributes, transmits or otherwise disseminates any such video not to make such video footage available to the general public on the internet or by any other means. If Tenant needs a copy of particular video footage from the NYPD Security System, Landlord shall reasonably cooperate with Tenant in making such request to the NYPD, but the decision to grant or withhold NYPD Security System footage and the decision to impose any conditions to granting such request rest solely with the NYPD.

(c)     Notwithstanding the foregoing, (i) Landlord shall not be responsible for providing security services or security cameras for the Commercial Usage Areas; and Tenant shall provide, or cause Subtenants to provide, for security arrangements in such areas that shall be consistent with the Concept of Operations and the Retail Standard, (ii) Landlord shall be required to post no more than one guard at a time at the facility's loading dock, which guard shall be required to notify (by telephone) the intended recipient of each delivery, and any supplemental personnel required to provide further for the efficient handling of deliveries at such loading dock shall be the responsibility of Tenant, and (iii) any supplemental security specially required in connection with Sponsorship Events shall (as the parties may determine on a case by case basis) either be arranged and paid for directly by Tenant or else arranged through Landlord's contractor but at Tenant's expense.

(d)     In order to maintain safety and security at the Fulton Center, Landlord reserves the right to install additional safety and security systems and devices for access to Back of House Areas, and/or to enact, apply and enforce any procedures and regulations as to Tenant, its Subtenants, their respective contractors, and the employees and agents of the foregoing (collectively, "Fulton Personnel"), as Landlord may from time to time deem necessary or desirable in its sole discretion. Such procedures and regulations may set forth guidelines for conducting background checks and Government security clearance for Fulton Personnel to be performed by Tenant (at Tenant's sole expense) and/or the production of photo-identification key cards to be issued by Landlord (at Landlord's sole expense) in order for Fulton Personnel to access the Back of House Areas, provided that any such background checks and security clearance and the procedures for performing or obtaining them shall be subject to Tenant's approval, which approval shall not be unreasonably withheld. Tenant shall comply, and shall use commercially reasonable efforts to cause Fulton Personnel to comply, with such safety and security procedures. In addition, Tenant shall cooperate with Landlord with respect to, and Tenant shall have no right to dispute, contest or challenge, any security procedures and requirements now or hereafter adopted by Landlord, NYPD, NYC Transit Security and/or the

MTA Police Department for the Public Circulation Areas, provided that the implementation and enforcement of such procedures and requirements shall be at Landlord's sole cost and expense. Tenant further acknowledges that the NYPD, NYC Transit Security and MTA Police Department shall have access to the Premises as the NYPD, NYC Transit Security and the MTA Police Department, respectively, may determine in their sole and absolute discretion at any time and for any reason. Tenant shall, and shall direct any Subtenants to, alert the MTA Police Department, NYC Transit Security or the NYPD to any suspicious activities observed in or around the Premises.

      7.5    *Sprinkler System.* As part of Landlord's Work, Landlord shall provide a fire protection sprinkler system in accordance with the Core and Shell/Base Building Plans and Specifications. Notwithstanding anything elsewhere in this Lease to the contrary, if applicable Law or Insurance Requirements require or recommend any modifications to such sprinkler system (such as additional risers, feed or cross mains or branch lines), alterations, or additional sprinkler heads or other equipment be made or supplied in an existing sprinkler system by reason of Subtenant Improvements, including the location of partitions, space design, layout, trade fixtures or other contents of any Sublet Premises, then Tenant or the applicable Subtenant shall modify the sprinkler system in such Sublet Premises, subject to Landlord's prior approval of the design of such modification, at Tenant's or such Subtenant's cost. Landlord shall, throughout the Term, at Landlord's cost and expense and in accordance with the Concept of Operations, maintain, test, repair and, to the extent required, replace, any and all portions of the fire protection sprinkler system within and/or serving the Premises, which shall constitute Landlord Controlled Equipment, excluding the portions of the sprinklers and auxiliary hose valve stations located within each Sublet Premises, which shall be the responsibility of Tenant or the applicable Subtenant to maintain, repair and replace as necessary. Testing of the sprinkler system shall comply with the requirements and conditions set forth in the Concept of Operations.

      7.6    *Fire Alarm System.* As part of Landlord's Work, Landlord shall install a fire and life safety system throughout the Premises that complies with applicable Law, and Landlord shall provide the Premises with a junction box wired to Landlord's fire alarm system for the connection of the fire alarm equipment installed by Tenant or Subtenants in each Sublet Premises, as required by applicable Laws (or any requirements of the FDNY) and as described in the Concept of Operations. All fire alarm equipment installed by Tenant or any Subtenant in the Commercial Usage Areas (excluding the RMUs, with respect to which Tenant or any Subtenant will not be required to install fire alarm equipment) shall be compatible with Landlord's fire alarm system and, upon request, Landlord shall provide the supplier's name of compatible fire alarm equipment. Tenant shall require that each Subtenant, at its expense, contract directly with Landlord's then designated electrical contractor for the connection of such Subtenant's fire alarm at the junction box. Tenant shall require each Subtenant to arrange for the inspection of the fire and life safety equipment in its Sublet Premises prior to opening for business and to obtain a certificate of fitness from the appropriate Government authority with respect thereto. Landlord shall, throughout the Term, at Landlord's cost and expense and in accordance with the Concept of Operations, operate, maintain, repair and, to the extent required, replace, any and all portions of the fire and life safety system serving the Premises, including the fire command center, which shall constitute Landlord Controlled Equipment, excluding, however, any fire alarm and

emergency system devices, including any doors, fans, fire alarm panels and control modules, located within each Sublet Premises. Tenant or each applicable Subtenant shall be responsible for maintaining, repairing and replacing, as necessary, and for testing, any fire alarm and emergency system devices located within each Sublet Premises, and any such testing shall be coordinated with Landlord.

> 7.7    *Compliance with FTA Requirements.*  Notwithstanding anything to the contrary contained elsewhere herein, the respective obligations of Landlord and Tenant under this Article 7 for maintenance, repairs and services in and to the Premises shall at all times be in accordance with the respective obligations of Landlord and Tenant with respect to the Pertinent Grant Management Requirements as set forth in **Exhibit O**. Both Landlord and the FTA shall have the right to inspect any and all portions of the Premises upon appropriate notice to Tenant, which, in the case of the FTA, shall be in accordance with the Grant Management Requirements. In addition to such periodic inspections, the FTA shall have the right at any time to inspect all of the assets incorporated in the Core and Shell/Base Building Improvements as of the Opening Date and to review any provided inventory and any and all books and records of Tenant kept in connection with the Premises and the repair, maintenance, services and other operations thereof, in the form required by the Pertinent Grant Management Requirements. Landlord shall coordinate any and all inspections by the FTA under this Section 7.7.

> 7.8    *No Other Services.*  Except as otherwise expressly provided in this Article 7 or elsewhere in this Lease, Landlord shall not be required to furnish or make available any other services to the Premises.

> 8.    *Construction.*

> 8.1    *Construction.*  During the Term, Tenant shall have the right to commence and complete, or cause Subtenants to commence and complete, Construction, subject to compliance with the following requirements:

> (a)    From and after the commencement of any Construction through and including the completion of same, Tenant shall carry, or cause Subtenants to carry, the insurance required pursuant to Section 14.3.

> (b)    Tenant shall deliver, or cause Subtenants to deliver, to Landlord or Landlord's Representative:

> (1)    upon request from Landlord in connection with any Major Construction, a copy of all Construction Documents with respect thereto;

> (2)    in connection with any Construction, a copy of any and all submissions, approvals and sign-offs required by the FTA in accordance with the Pertinent Grant Management Requirements, if any;

> (3)    in connection with any Construction, a copy of any and all Approvals as required by Law and Landlord's Code Compliance Officer necessary to enable Tenant and/or any Subtenant, as applicable, to commence and complete such Construction; and

23958769v39

(4)    in connection with any Construction, Plans and Specifications prepared by an Architect to the extent applicable Law requires preparation of Plans and Specifications for the type of Construction being proposed.

(c)    Tenant shall adhere to the Design Guidelines, and all applicable building and fire codes.  To the extent that Tenant, or any Subtenant, commences any Construction, Tenant shall complete, or use commercially reasonable efforts to cause such Subtenant to complete, such Construction with reasonable diligence and within a reasonable period of time. Tenant shall pay, or use commercially reasonable efforts to cause the applicable Subtenant to pay, for all Construction when and as required by the parties that perform such Construction.

(d)    Notwithstanding anything to the contrary herein, Tenant shall use commercially reasonable efforts to prevent any Construction  from disturbing in any manner whatsoever any NYCTA facilities and operations, including Landlord Controlled Property; if any Construction damages any Landlord Controlled Property, then Tenant shall be responsible for the reasonable costs of repairing or replacing such Landlord Controlled Property; and NYCTA shall have unrestricted access to any such NYCTA facilities and operations and Landlord Controlled Property, for the repair and maintenance of the thereof (including cameras within and/or adjacent to any vertical transportation equipment), all in accordance with the Concept of Operations, subject, however, to reasonable restrictions to such access during any Construction.

(e)    If any Construction occurs in the Public Circulation Areas or otherwise adjacent to any NYCT Retained Areas or affects any Landlord Controlled Property, Tenant shall be required to comply with the rules, regulations and procedures promulgated from time to time during the Term by the NYCTA Department of Security and/or NYCTA Maintenance of Ways Departments, respectively.  In such event, Tenant shall pay NYCTA its standard charges for overseeing and inspecting such Construction.

8.2    *Plans and Specifications; Code Compliance.*

(a)    Plans and Specifications (including working plans and specifications and "as-built" plans and specifications and surveys, as and to the extent required by applicable Law) for any Construction, shall be prepared by the Architect and promptly be submitted to Landlord for Landlord's approval, as and to the extent herein required.  Insofar as such Plans and Specifications relate to the Commercial Usage Areas, Landlord, in its capacity as landlord, may object to such Plans and Specifications only to the extent they call for alterations that would be inconsistent with the Design Guidelines (and Landlord refuses to waive any non-compliance following request by Tenant, which refusal may be in Landlord's sole discretion), and any such objection by Landlord shall include a listing of the specific items of non-compliance with the Design Guidelines.  Landlord shall approve or disapprove of the Plans and Specifications within the period of time set forth in the Design Guidelines.  The approval of Plans and Specifications or the consent by Landlord to any Construction, to the extent such approval is required under this Lease, does not constitute Landlord's representation that such Plans and Specifications or any Construction complies with any Laws.  Landlord shall not be liable to Tenant or any other party in connection with Landlord's approvals or disapprovals, as aforesaid.

23958769v39

(b)     Tenant shall be responsible to complete any and all Construction in compliance with the applicable building and fire codes specified from time to time by Landlord's Code Compliance Officer.  Landlord, in its capacity as a Government authority in determining Code Compliance and not as the landlord to this Lease, will not act in an arbitrary or capricious manner in connection therewith (such review process in Landlord's capacity as a Government authority being sometimes referred to herein as the "Code Compliance Review Process"). Tenant acknowledges that (x) the Code Compliance Review Process is separate from, and in addition to, the Design Review Process, and (y) the Code Compliance Review Process and Design Review Process may be conducted by different individuals any one of whom may be deemed to be Landlord's Code Compliance Officer in processing any required approvals, permits and certificates of compliance and occupancy in conformity with Code Compliance.

(c)     In reviewing Tenant's Plans and Specifications in connection with any Construction in its capacity as a Government authority, pursuant to the Code Compliance Review Process, Landlord and Landlord's Code Compliance Officer shall not be bound by any of the restrictions on scope of review, standards of reasonableness, or any other limitations, or restrictions imposed by this Lease on Landlord in its capacity as landlord, if any.

(d)     Landlord's fees for the review and approval of Plans and Specifications for Subtenant Improvements in accordance with the Design Review Process and the Code Compliance Review Process and for the issuance of Approvals for such Subtenant Improvements shall be in accordance with the following schedule (in each case multiplied by the CPI Adjustment Factor):

(1)     $3,000 for a retail store in the Fulton Building;

(2)     $6,000 for food service establishments or restaurants located on the street, platform or concourse levels of the Fulton Building;

(3)     $10,000 for food service establishments or restaurants located on the second or third levels of the Fulton Building;

(4)     $3,000 for a retail store on the ground floor of the Corbin Building;

(5)     $6,000 for a food service establishment or restaurant on the ground floor of the Corbin Building;

(6)     $5,000 for each upper floor of the Corbin Building; and

(7)     a single payment of $10,000 (exclusive of fees paid by Tenant directly to James Carpenter Associates for its participation in design development of the RMUs as contemplated by the Design Guidelines) to cover all RMUs.

No application or permit fees shall be required for any work performed by Tenant pursuant to the Concept of Operations.

23958769v39

21.3    *Title*.   All Improvements and Landlord Controlled Property, other than Subtenant Improvements, shall during the Term be owned by, and belong to, Landlord (subject to Tenant's leasehold interest under this Lease), unless herein elsewhere specifically provided.

22.    *Events of Default; Remedies*.

22.1    *Definition of "Event of Default"*.   An "Event of Default" means the occurrence of any one or more of the following:

22.1.1 *Monetary Default*.   If a Monetary Default occurs and continues for 10 Business Days after notice from Landlord, specifying in reasonable detail the amount of money not paid and the nature and calculation of each such payment.

22.1.2 *Prohibited Liens*.   If Tenant fails to comply with any obligation regarding Prohibited Liens and does not remedy such failure within 90 days after notice from Landlord.

22.1.3 *Bankruptcy or Insolvency*.   If Tenant or Guarantor ceases to do business as a going concern, ceases to pay its debts as they become due or admits in writing that it is unable to pay its debts as they become due, or becomes subject to any Bankruptcy Proceeding (except an involuntary Bankruptcy Proceeding dismissed within 120 days after commencement), or a custodian or trustee is appointed to take possession of, or an attachment, execution or other judicial seizure is made with respect to, substantially all of Tenant's or Guarantor's assets or Tenant's interest in this Lease (unless such appointment, attachment, execution or other seizure was involuntary and is contested with diligence and continuity and is vacated and discharged within 120) days).

22.1.4 *Nonmonetary Default*.   If any other Nonmonetary Default occurs and Tenant does not cure it within 30 days after notice from Landlord describing it in reasonable detail, or, in the case of a Nonmonetary Default that cannot with reasonable diligence be cured within 30 days from such notice, if Tenant shall not (x) within 30 days from Landlord's notice advise Landlord of Tenant's intention to take all reasonable steps to cure such Nonmonetary Default; (y) duly commence such cure and then diligently prosecute such cure to completion; and (z) complete such cure within a reasonable time under the circumstances; provided, however, that (i) if any Nonmonetary Default results from a default of a Subtenant, no Event of Default shall exist so long as Tenant is using diligent efforts to cause such Subtenant to remedy such default or Tenant is taking action to prohibit continued occupancy by such Subtenant; and (ii) if Tenant is impeded in curing any such Nonmonetary Default by the failure of Landlord to perform any of its obligations under this Lease, then no Event of Default shall exist for so long as Landlord fails to perform such obligations, and if Landlord remedies such failure, then no Event of Default shall exist so long as Tenant thereafter complies with clauses (x), (y) and (z) above.

23958769v39

22.1.5 *Chronic Default.* If (in the judgment of a court of competent jurisdiction):

(a) Tenant shall have, on multiple occasions and/or in multiple respects, willfully (i) failed to operate and maintain the Public Circulation Areas in accordance with the Retail Standard as required by this Lease, (ii) disregarded material requirements of Article 5, and/or (iii) otherwise failed to fulfill material obligations pertaining to the maintenance and operation of the Premises as set forth in this Lease (such pattern, as opposed to individual instances, of non-compliance being referred to herein as a "Chronic Default");

(b) Tenant shall have succeeded in preventing Landlord from terminating this Lease, by timely availing itself of Tenant's cure rights under Section 22.1.4 whenever presented with Default Notices with respect to particular instances of such Chronic Default, and yet shall have willfully persisted in such Chronic Default;

(c) Landlord shall have notified Tenant of Landlord's intention to invoke this Section 22.1.5 and offered to schedule a meeting between the Chief Executive Officer or Co-Chief Executive Officer of the ultimate parent company of Guarantor and the Chief Executive Officer of the MTA and/or President of NYCTA to discuss and agree upon a plan for Tenant to proactively and comprehensively address Tenant's deficiencies; and

(d) Tenant shall either (i) fail to meet with Landlord and submit a reasonably satisfactory remediation plan as provided in clause (c) within 15 days after receipt of such notice or (ii) thereafter fail to timely implement such remediation plan in all material respects, other than by reason of Unavoidable Delays.

22.1.6 *Remedies.* If an Event of Default occurs, then Landlord shall, at Landlord's option, have any or all of the following remedies, all cumulative (so exercise of one remedy shall not preclude exercise of another remedy), in addition to such other remedies as may be available at law or in equity or under any other terms of this Lease. Landlord's remedies include:

22.1.7 *Taking Possession.* Landlord may re-enter and take possession of the Premises with process of law, whether by summary proceedings or otherwise, and remove Tenant, with or without having terminated this Lease, and without thereby being liable for damages or guilty of trespass. This is intended to constitute an express right of re-entry by Landlord. Except as expressly provided in this Lease or prohibited by Law, Tenant, for and on behalf of itself and all persons claiming by, through or under Tenant, expressly waives any right to service of notice of intention to re-enter provided in any Law and any and all right of redemption provided by any Law, or re-entry or repossession or to restore the operation of this Lease if Tenant is dispossessed by a judgment or by warrant of any court or judge or in case of re-entry or repossession by Landlord or any expiration or termination of this Lease. No re-entry by Landlord, whether had or taken under summary proceedings or otherwise, shall absolve or discharge Tenant from liability under this Lease. The terms "enter," "re-enter," "entry," and "re-entry," as used in this Lease, are not restricted to their technical legal meanings.

89

23958769v39

22.1.8 *Suits Before Expiration Date*.  Landlord may sue for damages or to recover Rent from time to time at Landlord's election.

22.1.9 *Receipt of Moneys*.  No receipt of money by Landlord from Tenant after termination of this Lease, or after the giving of any notice of termination of this Lease, shall reinstate, continue, or extend this Lease or affect any notice theretofore given to Tenant, or waive Landlord's right to enforce payment of any Rent payable or later falling due, or Landlord's right to recover possession by proper remedy, except as this Lease expressly states otherwise, it being agreed that after service of notice to terminate this Lease or the commencement of suit or summary proceedings, or after final order or judgment for possession, Landlord may demand, receive, and collect any moneys due or thereafter falling due without in any manner affecting such notice, proceeding, order, suit or judgment, all such moneys collected being deemed payments on account of use and occupation or, at Landlord's election, on account of Tenant's liability.

22.1.10    *No Waiver*.  No failure by Landlord to insist upon strict performance of any covenant, agreement, term, or condition of this Lease or to exercise any right or remedy upon a Default, and no acceptance of full or partial Rent during continuance of any such Default, shall waive any such breach or Default or such covenant, agreement, term, or condition.  No covenant, agreement, term, or condition of this Lease to be performed or complied with by Tenant, and no Default, shall be Modified except by a written instrument executed by Landlord and Tenant. No waiver of any Default shall affect or alter this Lease.  Each and every covenant, agreement, term and condition of this Lease shall continue in full force and effect with respect to any other then existing or subsequent Default of such covenant, agreement, term or condition of this Lease.

22.1.11    *Security Devices*.  Following termination of this Lease in accordance with the terms hereof, Landlord may change the locks and other security devices providing admittance to the Premises.

22.1.12    *Conditional Limitation*.  Landlord may serve upon Tenant a written 30-day notice of cancellation and termination of this Lease; provided, however, that no such notice of cancellation or termination shall be valid or of any force or effect unless (a) Landlord proceeds, by appropriate judicial proceedings, in a court of competent jurisdiction and obtains a determination that an Event of Default has occurred and is then continuing, and (b) if there is  a final, non-appealable determination by the court that an Event of Default has occurred, such Event of Default is not cured within the period otherwise provided in the definition of Event of Default to remedy such default, which period shall commence upon the rendering of such final non-appealable determination.  Upon the expiration of such 30-day period, this Lease and the Term shall automatically and without any action by anyone terminate, expire, and come to an end, by the mere lapse of time, as fully and completely as if the expiration of such 30-day period were the Expiration Date.  The passage of such 30-day period constitutes the limit beyond which Tenant's tenancy no longer exists.  Tenant shall then quit and surrender the Premises to Landlord but

remain liable as this Lease provides.  It is a conditional limitation of this Lease that the Term shall terminate and expire as set forth in this paragraph.  This paragraph is intended to establish a conditional limitation and not a condition subsequent.  Nothing in this paragraph shall limit Landlord's right to commence and prosecute a summary dispossess proceeding under New York Real Property Actions and Proceeding Law Article 7.

22.1.13   *Damages*.  Subject to Section 28.2, Landlord may recover from Tenant all damages Landlord incurs by reason of Tenant's Events of Default including reasonable costs of recovering possession, reletting the Premises, and any and all other damages legally recoverable by Landlord, and reimbursement of Landlord's reasonable out of pocket costs, including Legal Costs and bank fees for checks returned by the bank.  Such damages may include, at Landlord's election, the net present value of the Rent payable to Landlord for the remainder of the then current Term of this Lease less the market rent for the remainder of such Term as of the date of Lease termination, discounted at 5% per annum.  However, Tenant acknowledges that such amount alone would not constitute an adequate measure of damages, as Tenant's undertaking to make various Capital Expenditures and incur various operating expenses when and as required over the entire Term has been a material inducement to Landlord affording Tenant the opportunity to exploit the revenue-generating potential of the Premises from and after the Opening Date.

22.1.14   *Injunction of Breaches*.  Whether or not an Event of Default has occurred, Landlord may obtain a court order enjoining Tenant from continuing any Default or from committing any threatened breach or Default.  Tenant specifically and expressly acknowledges that damages would not constitute an adequate remedy for any Nonmonetary Default.

22.1.15   *Continue Lease*.  Landlord may at Landlord's option maintain Tenant's right to possession.  In that case, this Lease shall continue and Landlord may continue to enforce it, including the right to collect Rent when due and any remedies for nonpayment.

22.1.16   *Restoration Funds*.  Upon any termination of this Lease pursuant to this Article 22, to the extent that Landlord then holds any Restoration funds, they shall be applied solely as Landlord directs, including as a payment toward any sums then payable to Landlord.

22.2   *Proceeds of Reletting*.  Landlord shall apply any proceeds of any reletting as follows, without duplication, but including any Default Interest on all such sums:

22.2.1 *Landlord's Costs*.  First, to pay to itself the cost and expense of terminating this Lease, re-entering, retaking, repossessing, repairing, performing any Construction, and the cost and expense of removing all persons and Premises therefrom, including in such costs reasonable and customary brokerage commissions and Legal Costs;

23958769v39

22.2.2 *Preparation for Reletting*.  Second, to pay to itself the cost and expense reasonably sustained in securing any new tenants and other occupants, including in such costs all brokerage commissions, Legal Costs, and any other reasonable costs of preparing the Premises for reletting;

22.2.3 *Costs of Maintenance and Operation*.  Third, to the extent that Landlord shall maintain and operate the Premises, to pay to itself the reasonable cost and expense of operating and maintaining the Premises; and

22.2.4 *Residue*.  Fourth, to pay to itself any balance remaining on account of the liability of Tenant to Landlord.

22.3    *Tenant's Late Payments; Default Interest*.  If Tenant fails to make any payment to Landlord required under this Lease within 10  days after such payment is first due and payable, then in addition to any other remedies of Landlord, and without reducing or adversely affecting any of Landlord's other rights and remedies, Tenant shall pay Landlord Default Interest on such late payment, beginning on the date such payment was first due and payable and continuing until the date when Tenant actually makes such payment, which is intended to compensate Landlord for the inconvenience and staff time incurred by Landlord to handle the late or missed payment, shall not be deemed a penalty or compensation for use of funds, and shall not be credited against any other obligations of Tenant under this Lease.  With respect to any payment of Rent other than Participation Rent and Guaranteed Minimum Rent, such payment shall not be due and payable until 30 days after demand by Landlord therefor. Default Interest payable on any deficiency determined based on a year-end reconciliation is governed by Section 4.7(c), and Default Interest on any underpayment determined based on an audit by Landlord is governed by Section 4.7.4.

22.4    *Holding Over*.  If for any reason or no reason Tenant remains in the Premises after the Expiration Date, then Landlord will suffer injury that is substantial, difficult, or impossible to measure accurately.  Therefore, if Tenant remains in the Premises after the Expiration Date, for any reason or no reason, then in addition to any other rights or remedies of Landlord, Tenant shall pay to Landlord, as liquidated damages and not as a penalty, for each month (prorated daily for partial months) during which Tenant holds over after the Expiration Date, a sum equal to 150% of the Participation Rent or Guaranteed Minimum Rent (whichever is higher), calculated on a monthly basis, payable under this Lease during the Lease Year preceding the Expiration Date.

22.5    *Waivers*.  LANDLORD AND TENANT IRREVOCABLY WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, COUNTERCLAIM, OR OTHER LITIGATION ARISING OUT OF OR RELATING TO THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT REGARDING THE PREMISES, ENFORCEMENT OF THIS LEASE, TENANT'S USE OR OCCUPANCY OF THE PREMISES, ANY CLAIM OF INJURY OR DAMAGE ARISING BETWEEN LANDLORD AND TENANT, OR ANY ACTIONS OF LANDLORD IN CONNECTION WITH OR RELATING TO THE ENFORCEMENT OF THIS LEASE.  TENANT WAIVES ANY RIGHT OF REDEMPTION PROVIDED FOR BY LAW.

22.6    *Accord and Satisfaction; Partial Payments.*   No payment by Tenant or receipt by Landlord of a lesser amount than the amount owed under this Lease shall be deemed to be other than a part payment on account by Tenant.  Any endorsement or statement on any check or letter accompanying any check or payment of Rent shall not be deemed an accord or satisfaction.  Landlord may accept any such check or payment without prejudice to Landlord's right to recover the balance of such Rent or pursue any other remedy.

22.7    *Miscellaneous.*   Landlord and Tenant further agree as follows with respect to any Defaults and Landlord's rights and remedies.

22.7.1 *Survival.*   No termination of this Lease and no taking possession of or reletting the Premises shall relieve Tenant of its liabilities and obligations hereunder, all of which shall survive such expiration, termination, repossession, or reletting.

22.7.2 *Multiple Suits.*   Landlord may sue to recover damages, or sums equal to any installment of Rent payable by Tenant, from time to time at Landlord's election.  Nothing in this Lease requires Landlord to await the date when this Lease or the Term would have expired absent an Event of Default and a resulting termination of this Lease.

22.7.3 *Receipt of Monies.*   Unless such payment shall fully cure all Monetary Defaults, no receipt of moneys by Landlord from Tenant after the giving of a termination notice or a notice to obtain possession, or after the retaking of possession by Landlord as aforesaid, shall reinstate, continue, or extend the Term or affect any notice previously given to Tenant, waive Landlord's right to enforcement of Rent payable by Tenant or thereafter falling due, or waive Landlord's right to recover possession of the Premises.  After the service of any such notice, or commencement of any suit or summary proceedings, or after a final order or judgment for possession of the Premises, Landlord may demand, receive, and collect any moneys due or thereafter falling due without in any manner affecting such notice, proceeding, order, suit, or judgment, unless such payments fully cure all Monetary Defaults.  Any sums so collected (without thereby curing all Monetary Defaults) shall instead be deemed payments on account of use and occupation of the Premises or, at Landlord's election, to have been made on account of Tenant's liability under this Lease.

22.7.4 *No Double Recovery.*   In no event shall Landlord be entitled, directly or indirectly, to recover twice for the same element of Landlord's damages.

23.    *Arbitration.*   If in accordance with the express terms of this Lease a dispute is to be resolved by Arbitration, then the following shall govern the Arbitration:

23.1    *Third-Party Arbitration.*   A   Party shall commence arbitration by delivering a notice to the other Party and to AAA stating that the initiating Party wishes to commence arbitration under this Lease (an "Arbitration Notice").  The arbitration shall be administered by AAA.  If the dispute is construction-related, then the arbitration shall be

23958769v39

administered under the Construction Industry Arbitration Rules and Mediation Procedures of the AAA, and if it is non-construction-related, then the arbitration shall be administered under the AAA's Arbitration Rules for the Real Estate Industry in effect at the time of commencement of the arbitration (in either case, the "Rules"), as modified by this Lease or by subsequent written agreement of the Parties.  The venue for any such arbitration shall be in New York, New York.  Within 10 days after receipt of the Arbitration Notice, the Parties shall apply to the AAA for a list of up to five arbitrators whose credentials best match the subject matter of the dispute.  If within 10 days following receipt of such list, the Parties are unable to agree on a proposed arbitrator, then within 3 Business Days following the elapse of such 10-day period each Party shall rank the proposed arbitrators in order of preference, and the arbitrator shall be appointed by the AAA according to the procedures provided in the rules for the appointment of a single arbitrator, which arbitrator (the "Arbitrator") shall be a member of the AAA panel of arbitrators.  The Arbitrator shall have at least 10 years of relevant experience in the subject matter of the dispute, and (ii) be disinterested and independent of either Party.  The Arbitrator shall be entitled, but not required, to provide that the losing Party in any arbitration will pay all or a portion of the prevailing Party's costs incurred in connection therewith, including the costs and fees of the Arbitrator, provided, however, if the Arbitrator declines to make such a provision, then the costs of the Arbitration will be split equally between the Parties (except that each Party will bear its own expenses and attorneys' fees).  The determination of the Arbitrator in the foregoing proceeding shall be binding upon the Parties.

          *23.2   Specific Provisions.*  The following specific provisions shall apply in respect of any such arbitration proceeding:

          (a)   Discovery, including any depositions, shall be governed by the Rules; provided, however, that the Arbitrator shall establish a discovery schedule so that all discovery, including depositions, shall conclude not later than 60 days after selection of the Arbitrator.

          (b)   Not later than 90 days after selection of the Arbitrator, the Arbitrator shall conduct a hearing to resolve the dispute.  Such hearing shall have a duration of not more than 5 days and shall be conducted in accordance with the following schedule:

               A.   Each Party shall be entitled to deliver an opening statement not to exceed 2 hours in length;

               B.   Each Party shall be entitled to deliver a closing argument not to exceed 2 hours in length; and

               C.   The Arbitrator shall have the right to require either Party to furnish any additional information they require in order to decide the dispute.

          (c)   The Arbitrator shall issue a written decision within 30 days after the completion of the arbitration hearing, which decision shall be binding upon the Parties.

          (d)   Any of the time limits set forth in this Section 23.2 may be extended by the Arbitrator for good cause shown after taking into account the Parties' intent in this Lease that

the arbitration should be expedited. The failure of any Party or the Arbitrator to comply with any time limit shall not invalidate the decision of the Arbitrator. Any dispute over compliance with the time limits set forth in the Rules or this Lease shall be a dispute that is subject to Arbitration.

(c)     Except as set forth herein to the contrary or to the extent prohibited by the Rules, any dispute hereunder shall be resolved in accordance with any expedited procedures provided for in the Rules, provided (i) that any notices in connection with an arbitration proceeding shall be given in accordance with Article 25 and (ii) a stenographic record of the arbitration hearing shall be made.

(f)     In order to facilitate the comprehensive resolution of related disputes, the Arbitrator shall consolidate the arbitration proceeding with any other arbitration proceeding under this Lease.

23.3     *Binding Effect.* The decision of the Arbitrator under Section 23.1 shall be final and binding on both Parties, and judgment may be entered thereon in any court having jurisdiction. If a Party fails to comply with the determination of the Arbitrator under Section 23.1, then the other Party shall be entitled to bring an action or proceeding in court to enforce such determination.

23.4     *Other Rights and Obligations Not Affected.* Notwithstanding the existence of a dispute, each Party shall continue to perform its respective other obligations under this Agreement.

24.     *End of Term.*     Upon the Expiration Date, (a) all Tenant Controlled Signage, Tenant/Subtenant Improvements and Tenant/Subtenant Equipment shall become Landlord's property unencumbered by this Lease; (b) Tenant shall deliver to Landlord possession of the Premises, in good condition, reasonable wear and tear excepted, subject to any Loss that this Lease does not require Tenant to Restore, provided, that in no event shall Tenant be required to remove any Subtenant Improvements, any Tenant Controlled Signage, Tenant/Subtenant Equipment or any Tenant/Subtenant FF&E (and all Subtenant Improvements, Tenant Controlled Signage ,Tenant/Subtenant Equipment and Tenant/Subtenant FF&E may be delivered to Landlord in their then "As Is" condition), except as otherwise expressly provided in the last sentence of this Article 24; (c) Tenant shall surrender any right, title, or interest in and to the Premises and deliver such evidence and confirmation thereof as Landlord reasonably requires; (d) Tenant shall deliver the Premises free and clear of all (i) Subleases, except as otherwise herein elsewhere specifically provided, and (ii) liens, except liens that Landlord or any of its agents caused; (e) Tenant shall assign to Landlord, without recourse, and give Landlord copies or originals of, all assignable licenses, permits, contracts, warranties, and guarantees then in effect for the Premises; (f) the Parties shall cooperate to achieve an orderly transition of operations from Tenant to Landlord (or a substitute tenant designated by Landlord) without interruption, including delivery of such books and records (or copies thereof) as Landlord reasonably requires; (g) the Parties shall adjust for Impositions and all other expenses and income of the Premises and any prepaid Rent and shall make such payments as shall be appropriate on account of such adjustment in the same manner as for a sale of the Premises (but any sums otherwise payable to Tenant shall first be applied to cure any Default); and (h) Tenant shall assign to Landlord (or a substitute tenant designated by Landlord), and Landlord shall reimburse Tenant for, all utility

and other service provider deposits for the Premises. Notwithstanding anything to the contrary in this paragraph, Tenant may remove from the Premises any Tenant/Subtenant FF&E, but Tenant must do so, if at all, before or within 30 days after the Expiration Date. Tenant shall not, however, remove any Tenant Controlled Signage, Tenant/Subtenant Improvements or Tenant/Subtenant Equipment or any portion thereof, except as Landlord may otherwise agree, and Tenant shall repair any damage to the Core and Shell/Base Building Improvements or Landlord Controlled Property from such removal. During such 30-day period, (x) Tenant may enter the Premises for such purpose, without being deemed a holdover; (y) Landlord shall have no obligation to preserve or protect such Tenant/Subtenant FF&E; and (z) in entering the Premises, Tenant shall comply with Landlord's instructions and requirements. Tenant/Subtenant FF&E not removed within 30 days after the Expiration Date shall be deemed abandoned. Notwithstanding the foregoing provisions with respect to Subtenant Improvements, Tenant/Subtenant Equipment and Tenant/Subtenant FF&E, if at the time Tenant enters into Subleases the obligation to remove tenant improvements and/or property at the end of the term is typically imposed on retail tenants, then Tenant will endeavor to impose such obligation on its Subtenants and shall use commercially reasonable efforts to enforce that obligation, including by seeking compensation from those Subtenants that abandon their improvements and/or property rather than removing it.

25.   *Notices*.  All notices, requests, demands, consents, designations or elections shall be in writing and shall be addressed to Landlord and Tenant (and their designated copy recipients) as set forth in **Exhibit F**.  Notices (including any required copies as set forth in **Exhibit F**) shall be delivered either (x) personally, by hand delivery (against a signed receipt), (y) by Federal Express or other overnight (one-night) courier service or (z) by certified mail (return receipt requested) to the addresses set forth in **Exhibit F**, in which case they shall be deemed delivered on the date of delivery (or when delivery has been first attempted, as evidenced by a receipt) to such address(es). Either Party may change its address by giving notice in compliance with this Lease.  Notice of such a change shall be effective only upon receipt. Any Party giving a notice may request the recipient to acknowledge receipt of such Notice.  The recipient shall promptly comply with any such request, but failure to do so shall not limit the effectiveness of any notice.  The Parties' attorneys may give any notice on behalf of their respective clients.

26.   *Brokers*.  Each Party (a) represents and warrants that it did not engage or deal with any broker or finder in connection with this Lease and no person is entitled to any commission or finder's fee on account of any agreements or arrangements made by such Party; and (b) shall indemnify the other Party against any breach of such representation.  Tenant shall be responsible for any and all broker or finder's fees, commission, or other forms of compensation which may be due and payable in connection with any Subleases, ad sales and/or Sponsorship Events permitted hereunder.

27.   *Additional Deliveries; Third Parties*.

27.1   *Estoppel Certificates*.  Up to twice a year, each Party may require the other Party to execute, acknowledge and deliver to the other Party (or directly to a designated third party) up to four original counterparts of an Estoppel Certificate.  Such other Party shall sign, acknowledge, and return such Estoppel Certificate within 15 days after request, even if the

23958769v39

requesting Party is in default. Any Estoppel Certificate shall bind the certifying Party to the extent set forth therein. In executing and delivering an Estoppel Certificate, Landlord shall have no obligation to waive any audit rights under this Lease, or to waive any rights with respect to any circumstance that Landlord, following inquiry of Landlord's Representative, does not actually understand to constitute a Default at the time such Estoppel Certificate is delivered, and the execution and delivery of an Estoppel Certificate by Landlord shall not constitute the waiver of such audit rights.

        27.2    *Further Assurances*. Each Party shall execute and deliver such further documents, and perform such further acts, as may be reasonably necessary to achieve the Parties' intent in entering into this Lease.

        27.3    *Net Lease*. Except as expressly provided in this Lease, this Lease is intended to be, and shall be construed as, an absolutely net lease, and the Rent shall be a completely net return to Landlord throughout the Term; and except as expressly provided in this Lease, Tenant shall pay any and all expenses, costs, obligations and charges whatsoever which shall arise, be incurred or become due during the Term with respect to or in connection with the improvement, operation, management, maintenance and repair of the Premises. Notwithstanding the foregoing, Tenant shall have no obligation to pay any interest, principal or other charges due or to become due under any lien or encumbrance voluntarily or involuntarily created, suffered or incurred by Landlord.

        27.4    *Modification*. Any Modification of this Lease must be in writing signed by the Party to be bound.

        27.5    *Successors and Assigns*. This Lease shall bind and benefit Landlord and Tenant and their successors and permitted assigns, but this shall not limit or supersede any Transfer restrictions provided for herein. Nothing in this Lease confers on any Person (except Landlord and Tenant) any right to insist upon, or to enforce against Landlord or Tenant, the performance or observance by either Party of its obligations under this Lease.

        28.    <u>*Miscellaneous*</u>.

        28.1    *Costs and Expenses; Legal Costs*. In the event of any litigation or dispute between the Parties, or claim made by either Party against the other, arising from this Lease or the landlord-tenant relationship under this Lease, or either Party's enforcement of this Lease upon a default by the other Party, or to enforce or interpret this Lease or seek declaratory or injunctive relief in connection with this Lease, or to exercise any right or remedy under or arising from this Lease, or to regain or attempt to regain possession of the Premises or terminate this Lease, or in any Bankruptcy Proceeding affecting the other Party to this Lease, the prevailing Party shall be entitled to reimbursement of its Legal Costs with Default Interest and all other reasonable costs and expenses incurred in enforcing this Lease or curing the other Party's default. With respect to an Arbitration, the allocation of Legal Costs is addressed in Article 23. If Tenant requests any amendment or modification to this Lease, then Tenant shall reimburse Landlord's Legal Costs incurred in considering, reviewing, and otherwise processing such request.

23058769v39

28.2 *No Consequential Damages.* Whenever either Party may seek or claim damages against the other Party (whether by reason of a breach of this Lease by such Party, in enforcement of any indemnity obligation, for misrepresentation or breach of warranty, or otherwise), neither Landlord nor Tenant shall seek, nor shall there be awarded or granted by any court, arbitrator, or other adjudicator, any speculative, consequential, collateral, special, punitive, or indirect damages, including loss of profits, whether such breach shall be willful, knowing, intentional, deliberate, or otherwise. The Parties intend that any damages awarded to either Party shall be limited to actual, direct damages sustained by the aggrieved Party.

28.3 *No Waiver by Silence.* Failure of either Party to complain of any act or omission on the part of the other Party shall not be deemed a waiver by the non-complaining Party of any of its rights under this Lease. No waiver by either Party at any time, express or implied, of any breach of this Lease shall waive such breach or any other breach.

28.4 *Performance Under Protest.* If a dispute arises regarding performance of any obligation under this Lease, the Party against which such obligation is asserted shall have the right to perform it under protest, which shall not be regarded as voluntary performance. A Party that has performed under protest may institute appropriate proceedings to recover any amount paid or the reasonable cost of otherwise complying with any such obligation, with interest at the Prime Rate.

28.5 *Survival.* All rights and obligations that by their nature are to be performed after any termination of this Lease shall survive any such termination.

28.6 *Unavoidable Delay.* Each Party's obligation to perform or observe any nonmonetary obligation under this Lease shall be suspended during such time as such performance or observance is prevented or delayed by Unavoidable Delays.

28.7 *Financial Statements.* Tenant shall deliver, or cause to be delivered, on or before May 1 of each calendar year during the Term, a financial statement of Guarantor, certified as true and correct in all material respects as of the date of such financial statement by a financial officer of Guarantor.

28.8 *Development Rights.* Landlord and Tenant agree that Landlord retains any and all unused air rights, development rights and comparable rights of any kind and nature with respect to the land underlying the Premises and that Tenant has no rights in and to same; and, subject to the provisions of this Section 28.8, Tenant hereby consents, without further consideration, to any utilization of such rights by Landlord. Tenant hereby irrevocably waives any and all rights it may have (as a "party-in-interest" or otherwise) in connection with any zoning lot merger or transfer of development rights with respect to the Premises, including any rights it may have to be a party to, to contest, or to execute, any Declaration of Restrictions (as such term is defined in Section 12-10 of the Zoning Resolution of the City of New York effective December 15, 1961, as amended) that would cause the land underlying the Premises to be merged with or unmerged from any other zoning lot pursuant to such Zoning Resolution or to any document of a similar nature and purpose, and Tenant agrees that this Lease shall be subject and subordinate to any Declaration of Restrictions or any other document of similar nature and purpose now or hereafter affecting such land so long as such declaration does not impair in any

respect the Leasehold Estate.  Tenant shall cooperate with Landlord, without cost or expense to Tenant, in all respects to effectuate any such zoning lot merger or transfer of development rights. Without limiting the generality of the foregoing, Tenant shall execute and deliver all documents or instruments necessary or desirable to evidence or effectuate any such transfer, and, in confirmation of Tenant's subordination and waiver hereunder, Tenant shall execute and deliver promptly any certificate or instrument that Landlord reasonably may request.  In connection with Tenant's cooperation, Tenant hereby irrevocably constitutes and appoints Landlord as Tenant's attorney-in-fact to execute any such certificate or instrument for and on behalf of Tenant, such power of attorney being coupled with an interest. Notwithstanding the foregoing, nothing in this Section 28.8 shall permit Landlord or any other Person to alter the façades or entrances of the Fulton Building or the Corbin Building or to construct any improvements above such buildings, except that (i) Landlord may permit improvements to encroach on the west side of the land on which the Corbin Building and the Fulton Building are situated by cantilevering such improvements not more than 10 feet onto such land, provided that the lowest point of such cantilevered improvements is not less than 30 feet above the highest point of the Fulton Building and Corbin Building and provided that no such cantilevering shall affect the legal right of Landlord following a casualty to rebuild the Fulton Building or the Corbin Building substantially in accordance with the Core and Shell/Base Building Plans and Specifications.  To facilitate any transfer of development rights from the land under the Fulton Building and Corbin Building to the block that includes the Dey Street Headhouse, Landlord shall have the right to have the exterior of the Corbin Building designated a "landmark" subject to the jurisdiction of the New York City Landmarks Preservation Commission ("LPC"), provided that such designation subjects the Corbin Building to (a) no material restrictions on Tenant's use of the Corbin Building or on retail signage to which the Corbin Building is not already subject pursuant to the State Historic Preservation Office ("SHPO") requirements that are referenced in the Design Guidelines, and (b) no material requirements for inspecting or maintaining the façade of the Corbin Building to which the Corbin Building is not already subject pursuant to such SHPO requirements, and provided that (A) Landlord compensates Tenant for any incremental cost or expense resulting from such designation, and (B) Landlord is able to demonstrate to Tenant, through a review of applicable LPC and SHPO Law and regulations, that the foregoing clauses (a) and (b) are satisfied.  In addition, at any time, Landlord shall have the right to make alterations to the Dey Street Headhouse, allow construction to occur in the airspace over the Dey Street Headhouse, and/or permit new connections to be made between the Dey Street Concourse and adjacent buildings, so long as (A) Landlord fully compensates Tenant for any temporary or permanent loss of net revenues and loss of value suffered by Tenant by reason of such alterations, constructions or  connections or the making thereof, including any such loss arising from (i) the removal of RMUs or Tenant Controlled Signage in the Dey Street Headhouse and/or Dey Street Concourse during such construction, (ii) the cost of replacing any such RMUs and Tenant Controlled Signage, including design, construction, installation and purchase costs, and (iii) foot traffic being diverted from the Dey Street Concourse or Dey Street Headhouse, (B) Landlord uses commercially reasonable efforts (i) to minimize interference with Tenant and any Subtenants during the performance of such work, and (ii) to keep the Dey Street Concourse free of debris, dirt, dust, trash, equipment, materials  and other byproducts generated by such work, (C) in no event shall the Dey Street Concourse be closed at any time or for any period of time on account of such construction, and (D) if the Dey Street Headhouse is closed, such closure shall

23958709v39

be temporary and it shall be replaced by an entrance that is comparable in size and location to the Dey Street Headhouse.

29. *Interpretation, Execution, and Application of Lease.*

29.1 *Captions.* The captions of this Lease are for convenience and reference only. They in no way affect this Lease.

29.2 *Counterparts.* This Lease may be executed in counterparts.

29.3 *Delivery of Drafts.* Neither Party shall be bound by this Lease unless and until such Party shall have executed and delivered at least one counterpart of this Lease. The submission of drafts or comments on drafts shall bind neither Party in any way. Such drafts and comments shall not be considered in interpreting this Lease.

29.4 *Entire Agreement.* This Lease, together with the letter agreement between Landlord and Tenant executed on the Lease Execution Date, contains all understandings or agreements, oral or written, regarding their respective rights and obligations to each other regarding the Premises. The Parties have no other understandings or agreements, oral or written, about the Premises or Tenant's use or occupancy of, or any interest of Tenant in, the Premises.

29.5 *Governing Law.* This Lease, its interpretation and performance, the relationship between the Parties, and any disputes arising from or relating to any of the foregoing, shall be governed, construed, interpreted, and regulated under the laws of the State, without regard to principles of conflict of laws. The Parties agree that any state or federal district court located in the County of New York, State of New York shall have exclusive jurisdiction over any case or controversy arising from, under or in connection with this Lease and shall be the sole and exclusive forum in which to adjudicate any such dispute, except for any dispute that by the express terms of this Lease is to be resolved by Arbitration.

29.6 *Partial Invalidity.* If any term or provision of this Lease or its application to any Party or circumstance shall to any extent be invalid or unenforceable, then the remainder of this Lease, or the application of such term or provision to persons or circumstances except those as to which it is invalid or unenforceable, shall not be affected by such invalidity. All remaining provisions of this Lease shall be valid and be enforced to the fullest extent Law allows.

29.7 *Principles of Interpretation.* No inference in favor of or against any Party shall be drawn from the fact that such Party has drafted any part of this Lease. The Parties have both participated substantially in its negotiation, drafting, and revision, with advice from counsel and other advisers. A term defined in the singular may be used in the plural, and vice versa, all in accordance with ordinary principles of English grammar, which also govern all other language in this Lease. The words "include" and "including" shall be construed to be followed by the words: "without limitation." Each of the following terms shall be interpreted as if followed by the words "(or any part of it)" except where the context clearly requires otherwise: Base Building Equipment; Landlord Controlled Property; Fee Estate; Leasehold Estate; Premises; Non-Structural Components; Structural Components; Subtenant Improvements;

23958769v39

Tenant/Subtenant Equipment; Tenant/Subtenant FF&E, Tenant Controlled Signage and any other similar collective noun. Every reference to any document, including this Lease, refers to such document as Modified from time to time (except, at Landlord's option, any Modification that violates this Lease), and includes all exhibits, schedules, and riders to such document. The word "or" includes the word "and."

29.8    *Lobby Law Certification.* The Parties recognize that the entry into this Lease is subject to the New York State Finance Law Sections 139j and k (the "Lobbying Law"). Tenant hereby certifies that all information provided to Landlord with respect to the Lobbying Law is complete, true and accurate. Attached as **Exhibit X** is a copy of the Disclosure Statement and Proposer's Affirmation and Certification, in substantially the form completed on behalf of Tenant as part of the competitive bid process for this Lease. Landlord is authorized to terminate this Lease in the event such certification is found to be intentionally and materially false or incomplete by providing written notification to Tenant in accordance with the notice provisions of this Lease.

*[Signatures on Next Page.]*

23958769v39

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Lease on the Lease Execution Date.

**METROPOLITAN TRANSPORTATION AUTHORITY**

By: _____

      Jeffrey B. Rosen
      Director, Real Estate

**WESTFIELD FULTON CENTER LLC**
a Delaware limited liability company
By:    Westfield Property Management LLC, its managing
      member

    By: _____

      Peter R. Schwartz
      Senior Executive Vice President and Secretary

NYCTA is signing below to evidence its agreement to be bound by Sections 5.1.7 and 5.2.4:

NEW YORK CITY TRANSIT AUTHORITY

By :   Metropolitan Transportation Authority

    By: _____

      Jeffrey B. Rosen
      Director, Real Estate

Guarantor is signing below to evidence its agreement to make the representations and warranties made in Sections 16.1(c) and 16.2:

**WESTFIELD AMERICA LIMITED PARTNERSHIP,**
a Delaware limited partnership,
By:    Westfield U.S. Holdings, LLC,
      a Delaware limited liability company

    By: _____

      Peter R. Schwartz
      Senior Executive Vice President and Secretary

**EXHIBIT A**
LEASE DEMARCATION PLANS

(SEE ATTACHED)

23958769639